**UNITED STATES of America,**

v.

**Roy William HARRIS a/k/a Will Harris, Defendant.**

No. S1 92 Cr. 455 (CSH).

United States District Court, S.D. New York.

Oct. 23, 1992.

Otto G. Obermaier, U.S. Atty., New York City (Howard M. Shapiro, Julie R. O'Sullivan, Asst. U.S. Attys., of counsel), for U.S.

Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City (Lawrence Iason, Diana D. Parker, Robert B. Buehler, of counsel), for defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In a 24–count superseding indictment, the government charges defendant Roy William Harris with conspiring to violate the wire fraud statute, 18 U.S.C. § 1343, and the bank fraud statute, 18 U.S.C. § 1344. The government also charges Harris with substantive violations of § 1344; the money laundering statute, 18 U.S.C. § 1956(a)(2); the wire fraud statute, § 1343; making a false statement to a bank in connection with a loan, in violation of 18 U.S.C. § 1014; and participating in a continuing financial crimes enterprise, in violation of 18 U.S.C. § 225. Lastly, the government prays for criminal forfeiture of designated property under 18 U.S.C. § 982.

Defendant moved to dismiss certain counts of the original indictment and to sever another. The government responded to defendant's motion by obtaining from the grand jury a superseding indictment. The government says the superseding indictment cured any arguable defects in the original charging instrument. Defendant says the superseding indictment is as flawed and deficient as its predecessor. These predictable appraisals extended the briefing process. Defendants have filed three briefs and the government two.

## I.

### A. *The Superseding Indictment*

The indictment alleges that at the relevant times, defendant Harris was the president, chief executive officer, and record owner of 60% of the stock of Arochem International, Inc. ("International") and Arochem Corporation ("Arochem"), collectively referred to as the "Arochem Companies." The Arochem Companies were incorporated in 1988.

International operated a petroleum and petrochemical refinery complex in Puerto Rico. Arochem, which maintained its principal offices in Connecticut, traded in petroleum and petroleum products and provided management services to International, including supervising the inventory and trading activities of International and marketing petrochemicals and petroleum products.

The indictment further alleges that defendant was the sole shareholder and managing director of Arochem International, Ltd. ("Limited"), based in the Cayman Islands, which engaged in trading and financing of crude oil and petroleum products.

In or about January of 1990, a consortium of banks led by Chase Manhattan Bank, N.A. entered into a revolving credit agreement with the Arochem Companies, which permitted the Companies to borrow up to $245 million as needed for their business operations. The loans were secured by the Companies' inventory of petroleum and petroleum products and by their receivables and cash.

The initial credit agreement expired in January 1991. The Arochem Companies and the Chase group of banks extended the agreement on six separate occasions through November 30, 1991. During the lifetime of the agreements and the extensions, the Arochem Companies agreed to maintain minimum levels of tangible net worth, net income, working capital, and inventory, and to limit the net trading positions that the Companies could hold. These agreements, the government alleges, were intended to protect the lending banks by permitting them to call outstanding loans and discontinue ongoing lending facilities if the financial stability of the Arochem Companies became threatened. The limit on trading positions was designed to prevent the Arochem Companies from engaging in excessive speculative trading.

The loan agreement required the Arochem Companies to provide periodic reports, known as "borrowing base reports," to the lending banks. The borrowing base reports set forth the Companies' assets, liabilities and trading positions, including the crude oil inventory and "forward purchases of inventory" that the Arochem Companies had purchased for refining at International's refinery in Puerto Rico. A "forward purchase of inventory" reflects a contract for future delivery of petroleum or related products. The indictment alleg-

es that the banks required the information contained in the borrowing base reports, together with other unspecified financial statements and verbal and written submissions, "in order to determine whether the Agreement's covenants were being met, and, accordingly to decide whether to call outstanding loans, whether to discontinue ongoing lending facilities, and whether to extend the Agreement each time it expired." Superseding Indictment at ¶ 4.

Between January 1990 and December 9, 1991, the Arochem Companies submitted borrowing base reports to the lending banks which represented that the eligible collateral securing the loans exceeded $200 million. As of November 30, 1991 "based on these financial statements and borrowing base reports," the Companies had borrowed about $200 million from the banks. In fact, the collateral held by the Arochem Companies as of November 30, 1991 was less than $35 million. In February 1992, the group of lending banks filed an involuntary bankruptcy petition against the Arochem Companies in the United States Bankruptcy Court for the District of Connecticut. The government alleges that the Chase group of banks has lost in excess of $150 million on its loans to the Arochem Companies. *Id.* at ¶ 5–6.

Against this factual background, the superseding indictment alleges the following fraudulent scheme. Harris and other unnamed officers and employees at the Arochem Companies are charged with having fraudulently induced the Chase group of banks "to lend and continue lending more than $200 million to the Arochem Companies." *Id.* at ¶ 7. The following specific conduct is alleged:

Defendant and his co-conspirators concealed the true financial condition of the Arochem Companies from the lending banks and the Companies' independent auditors by submitting information to the banks which fraudulently overstated the Companies' assets and understated its liabilities.

As a further part of that scheme, defendant misappropriated monies belonging to the Arochem Companies for his own personal benefit.

Defendant and his co-conspirators concealed from the banks excessively speculative trading practices prohibited by the loan agreement.

This conduct is alleged in ¶ 7 of the superseding indictment, which concludes with the allegation that the false and fraudulent information provided by the Arochem Companies "was designed to and did in fact induce the Chase group of banks to lend and continue lending to the Arochem Companies."

¶¶ 8–10 of the superseding indictment allege the following conduct:

Defendant and other officers and employees of the Arochem Companies fraudulently understated the Companies' liabilities and overstated their inventories, net income and other assets "by creating and causing the creation of false and fictitious contracts, invoices, receipts, wire transfers and other documentation." In particular, in April 1990 defendant created false and fraudulent documentation, including invoices and warehouse receipts, purporting to show that International had entered into contracts for the delivery of approximately $60 million worth of Tapis crude oil which it held in Malaysia. Thereafter, between April 29, 1990 and November 4, 1990, defendant caused to be submitted to the lending banks a series of borrowing base reports that fraudulently represented that the Arochem Companies possessed this inventory, whereas in fact they did not. ¶ 9.

As a further particular instance of fraudulent conduct, the government alleges that defendant and others created "at least three additional sham contracts that falsely and fraudulently stated that International owned approximately $48 million of petroleum condensate," an inventory item which defendant included in borrowing base reports issued to the banks between May 1991 through December 9, 1991, whereas the Arochem Companies did not own and hold such inventory. ¶ 10.

¶ 11 of the superseding indictment alleges that throughout 1990 and 1991, Harris caused the Arochem Companies "to hold

net open positions far in excess of the one million barrel net trading position limitation imposed" by the loan agreement, thereby exposing the Arochem Companies and the lending banks "to excessive trading risk," trading practices violative of the lending agreement and which Harris and his co-conspirators concealed from the banks.

¶ 12 of the superseding indictment charges defendant with the "fraudulent diversion of funds." In particular, the superseding indictment alleges that "[o]n four occasions between June and October 1991, at a time when Limited owed money to the Arochem Companies, Harris transferred a total of approximately $3.7 million from Limited's accounts in Switzerland to defendant's personal account at the Bank of New York, an amount which far exceeded Limited's net equity." This conduct, the government alleges, reflects a conspiracy to violate the wire fraud statute, 18 U.S.C. § 1343, and the bank fraud statute, 18 U.S.C. § 1344. It was a scheme, ¶ 14 alleges, "to defraud the minority shareholders of the Arochem Companies" and the lending banks "which collectively had lent more than $200 million to the Arochem Companies."

Counts Two through Eight allege substantive violations of the bank fraud act. After incorporating by reference the allegations of Court One, the bank fraud counts are introduced by ¶ 17, which alleges that on the dates set forth with respect to each count, defendant "executed and attempted to execute a scheme and artifice to defraud" the lending banks "by falsely representing the assets, liabilities and trading positions of the Arochem Companies to the New York offices of these financial institutions, directly and indirectly." Count Two refers to the "original agreement," and Counts Three through Eight to each of the six extensions. The time period alleged with respect to each count apparently reflects the period covered by the original agreement or the particular extension.

Count Nine charges defendant with violation of the money laundering statute, 18 U.S.C. § 1956(a)(2). The government alleg-

es that defendant transferred approximately $7.5 million from the Arochem Companies' accounts at Chase Manhattan Bank in New York through the Union Trust Company in Connecticut and into Swiss bank accounts owned by Limited, knowing that these funds were the proceeds of frauds on financial institutions. ¶ 19. By transferring those funds, the government alleges, defendant "concealed from the Chase group of banks the extent to which he was utilizing Limited to finance cargoes in transit and trading activities."

Counts Ten through Twenty–One allege violations of the wire fraud statute, 18 U.S.C. § 1343. Specifically, the government refers to defendant's transfer of funds of the Arochem Companies in New York to the Swiss bank accounts owned by Limited. The government alleges that these transfers were for the purpose of executing defendant's scheme to defraud the lending banks. It is alleged at ¶ 21: "The monies held by the Arochem Companies at Chase Manhattan Bank were the proceeds of the working capital revolving credit facility extended by the Chase group of banks, and as such, were monies due to be repaid to the Chase group of banks at the conclusion (or default) of the loans." Counts Ten through Twenty–One each refer to a single transfer of money, the first occurring on April 12, 1991 and the last on September 19, 1991.

Count Twenty–Two charges defendant with conducting a continuing financial crimes enterprise, in violation of 18 U.S.C. § 225.

Count Twenty–Three alleges that in November 1989 defendant knowingly made a false statement for the purpose of influencing the Bank of New York to extend a loan to him, in violation of 18 U.S.C. § 1014.

In Count Twenty–Four the government prays for forfeiture of certain specified property of defendant, in accordance with 18 U.S.C. §§ 982(a)(1) and 982(b)(2).

### B. *The Defendant's Motions*

Defendant's motion does not challenge Count One or Count Twenty–Four. But he challenges all the other counts. As to the

bank fraud counts, Counts Two through Eight, defendant contends they must be dismissed because they do not adequately allege bank fraud. In the alternative, defendant says that the bank fraud counts are multiplicitous and should be dismissed or merged into a single count.

As to the money laundering count, Count Nine, and the wire fraud counts, Counts Ten through Twenty-One (which form the predicates for the money laundering count), defendant contends they should be dismissed because the indictment fails to allege a scheme to defraud the victim of its money or property.

With respect to Count Twenty-Two, the continuing financial crimes enterprise count, defendant contends that the statute is constitutionally void for vagueness.

Lastly, defendant moves to sever Count Twenty-Three from the trial of the other counts.

## II.

### A. *The Bank Fraud Counts*

#### 1. Sufficiency of Allegations

■ Counts Two through Eight charge violations of 18 U.S.C. § 1344, which provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

To charge an offense under the statute, the government must allege conduct by defendant "designed to deceive a . . . financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss." The indictment is sufficient if it "allege[s] a scheme that was intended to victimize a bank." This requires a "nexus" between the defendant's conduct and the victim bank. "Common sense" must inform the reading of the indictment; and the bank fraud statute itself, enacted to protect banks' financial integrity, "should be read expansively." *United States v. Stavroulakis,* 952 F.2d 686, 694–95 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992).

Notwithstanding that expansive reading, the bank fraud statute does not apply to "situations where money is merely withdrawn legally from a federally insured bank by a victim and where the bank itself is in no way victimized." *United States v. Blackmon,* 839 F.2d 900, 904 (2d Cir.1988). But "the bank need not actually be victimized"; attempting to execute a fraudulent scheme "with the intent to victimize the bank" falls within the statute. *Stavroulakis* at 694. And a bank is "victimized" within the ambit of the statute even if the scheme targets an accountholder's money, so long as the fraudulent conduct is directed at the bank with the intent of deceiving it so that the bank loses custody over its customer's funds. *United States v. Morgenstern,* 933 F.2d 1108, 1114 (2d Cir.1991); *Blackmon* at 905–06 n. 5.

In the case at bar, the bank fraud counts are facially sufficient. In addition to tracking the language of the statute, the superseding indictment alleges a considerable amount of detail. According to the indictment, the banks themselves were the direct intended victims. They lent their own money to the Arochem Companies, and are out $150 million in consequence. The banks bargained for, received and relied upon assurances by the Arochem Companies that they would conduct their affairs in such a way as to minimize the lending banks' risk. The banks bargained for, received and relied upon a series of borrowing base reports from the Arochem Companies designed to reassure the banks that these operational limitations were being observed. Throughout the entire time embraced by the loan agreement and its extensions, defendant is alleged to have fraudulently overstated the Arochem Companies' assets and understated its liabilities, concealed speculative trading practices prohibited by the loan agreement, and falsi-

fied numerous documents, including the borrowing base reports. In consequence of that fraudulent conduct, the banks are alleged to have entered into the loan agreement in the first place, and to have extended it six times thereafter, until the magnitude of the Arochem Companies' defaults prompted the banks to place them into bankruptcy.

These detailed factual allegations, contained in the conspiracy count and incorporated by reference in the preamble to the substantive bank fraud counts, are sufficient to charge defendant with violating the bank fraud statute.

Defendant says accurately that the particular fraudulent acts described in the indictment cannot be tied "either to any particular action by the consortium [of lending banks] or to any specific count in the indictment." Reply Brief at 5. But these are evidentiary details, and the government "is not required to set forth evidentiary matter" to preserve an indictment from a motion to dismiss, provided that the indictment "tracks the statutory language and specifies the nature of the criminal activity," *United States v. Carr*, 582 F.2d 242, 244 (2d Cir.1978). Assuming for the present analysis that the bank fraud counts are not dismissed as multiplicitous, *see* Point II(A)(2) *infra*, questions may arise at the end of the government's case in chief with respect to the sufficiency of its evidence in support of a particular count or counts. Count Two furnishes an example. Defendant argues that no conduct alleged in the superseding indictment could conceivably have induced the banks to enter into the original loan agreement. If that turns out to be a fair characterization of the government's trial proof, defendant has his remedy under Rule 29, Fed.R.Crim.P. But I deny defendant's motion to dismiss the bank fraud counts prior to trial.

### 2. Multiplicity

In the alternative, defendant contends that Counts Two through Eight are multiplicitous.

"A claim of multiplicity requires the court to determine whether an indictment charges a single offense in more than one count." *United States v. Maldonado–Rivera*, 922 F.2d 934, 969 (2d Cir.1990). "The multiplicity doctrine is based upon the double jeopardy clause of the Fifth Amendment, which 'assur[es] that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.'" *United States v. Fiore*, 821 F.2d 127, 130 (2d Cir.1987) (citing and quoting *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977)). A multiplicitous indictment may be contrasted with a duplicitous indictment, which charges numerous crimes in a single count. *United States v. Lartey*, 716 F.2d 955, 968 (2d Cir.1983).

Where a defendant is charged with violations of different statutory provisions, "the multiplicity inquiry requires analysis of whether the offenses charged in the various counts are sufficiently distinguishable from one another to permit a reasonable inference that Congress intended to authorize multiple punishments." *Maldonado–Rivera* at 969; *see also Fiore* at 130–31; *United States v. Nakashian*, 820 F.2d 549, 551–52 (2d Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987).

This is not such a case. Counts Two through Eight charge defendant with violations of only one statutory provision: the bank fraud statute, 18 U.S.C. § 1344. It is necessary to consider the statutory scheme.

Defendant contends that the bank fraud statute "prohibits only the execution or the attempt to execute, each scheme to defraud a bank. The statute does not punish each act conducted in furtherance of the scheme." Main Brief at 14. In that regard, defendant's argument continues, § 1344 differs from the mail fraud statute, 18 U.S.C. § 1341, and the wire fraud statute, § 1343. The mail fraud statute, after referring to "any scheme or artifice to defraud," goes on to provide that an individual who "for the purpose of executing such scheme or artifice or attempting so to do places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ..." shall be fined or imprisoned or both. Similarly, § 1343, af-

ter referring to "any scheme or artifice to defraud," goes on to provide that anyone who "transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds, for the purpose of executing such scheme or artifice" shall be imprisoned or fined or both. It is well established under these statutes that each use of the mails or use of the wires constitutes a separate offense, "notwithstanding the fact that the defendant may have been engaged in one fraudulent scheme," *United States v. Calvert*, 523 F.2d 895, 914 (8th Cir.1975).

But defendant stresses that the bank fraud statute, § 1344, although generally modeled upon these earlier anti-fraud statutes, differs from them in that there is no provision that each act in furtherance of the scheme (such as a mailing or a wire communication) constitutes a separate offense.

In *United States v. Lemons*, 941 F.2d 309 (5th Cir.1991), the Fifth Circuit regarded that distinction as crucial:

> The fact that each act in execution of a scheme is a punishable offense under the mail or wire fraud statutes does not allow reading the bank fraud statute to likewise punish each act in furtherance, or execution, of the scheme; but the bank fraud statute imposes punishment only for each execution of the scheme. *Id.* at 318.

It held the bank fraud counts proved at trial to be multiplicitous:

> As stated, although the acts charged in counts 1–8 were in furtherance of the scheme, there was but one execution of the scheme. To hold otherwise, on these facts, renders the reach of § 1344 potentially boundless. *Id.* (footnote omitted).

In *Lemons* the Fifth Circuit discussed *United States v. Poliak*, 823 F.2d 371 (9th Cir.1987), *cert. denied*, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988), and *United States v. Schwartz*, 899 F.2d 243 (3rd Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990), in which the Ninth and Third Circuits rejected, on the facts before them, defense contentions that

bank fraud counts were multiplicitous. The *Lemons* court said that "on the facts in this case, we do not see ourselves in conflict with *Poliak*." 941 F.2d at 317 n. 5. It did not quite say that with respect to *Schwartz*.

There appears to be no Second Circuit case considering whether counts alleging violations of the bank fraud statute are multiplicitous. In *United States v. Jones*, 648 F.Supp. 241, 242–43 (S.D.N.Y.1986), *aff'd in part, rev'd in part and vacated in part on other grounds sub nom., United States v. Blackmon*, 839 F.2d 900 (2d Cir. 1988), this Court held without extended discussion that counts charging violations of § 1344 were not multiplicitous where "[e]ach count alleged a separate, fraudulently induced withdrawal from a federally insured bank in furtherance of the underlying fraudulent scheme." On appeal from defendants' convictions the Second Circuit did not reach the multiplicity issue. The particulars of the scheme, a street confidence game known as the "pigeon drop," are set forth in an earlier decision of this Court, 648 F.Supp. 225 at 226–28, and quoted by the Court in *Blackmon* at 839 F.2d at 902 n. 2. For present purposes, it is sufficient to say that the defendants, in furtherance of their fraudulent scheme, preyed successively and successfully upon a series of elderly women, eventually separating them from monies which the victims had maintained on deposit in federally insured banks.

*Jones* is distinguishable, the defendant at bar argues, because there is only one victim of the alleged fraudulent scheme, namely, the same consortium of lending banks.

I think that the multiplicity *vel non* of counts charging § 1344 violations depends upon the particular facts of the case. That was the view of the Fifth Circuit in *Lemons*, the case most favorable to defendant and upon which he places principal reliance. *Lemons* agrees with the statement in *Poliak* that § 1344 "allows charging each execution of the scheme to defraud," 823 F.2d at 372, going on to say: "Obviously, the question in each case is what constitutes an

'execution of the scheme.'" 941 F.2d at 309 n. 5. Consistent with that approach, the *Lemons* court cautioned at 318 n. 6 that "[w]e do not hold that the execution of a scheme cannot result in the imposition of multiple liability under § 1344 against an individual," thereupon citing with approval *United States v. Farmigoni,* 934 F.2d 63 (5th Cir.1991). In *Farmigoni* the defendant bank officer signed and issued a fraudulent letter credit from his bank, which was used to fraudulently obtain a loan from another bank in another state. The Fifth Circuit held that defendant's plea of guilty to a § 1344 indictment for defrauding his bank could not bar, on double jeopardy grounds, a separate indictment under § 1344 for defrauding the other bank, "[a]lthough both indictments arouse out of the same initial scheme," 934 F.2d at 66.

The defendant in *Lemons* was an officer of a savings and loan association. Defendant acted with others in devising and executing a scheme to defraud his S & L employer in connection with a loan to a real estate developer. That real estate transaction resulted in defendant's conviction on eight counts of bank fraud in violation of § 1344. Count One charged defendant with authorizing a payment to a co-schemer from the loan proceeds; Count Two with causing the S & L to fund the real estate loan; and Counts Three through Eight with receiving, at various times, payments of amounts or forgiveness of debts from other individuals, those payments or forgivenesses representing defendant's benefit from the real estate transaction. *See* 941 F.2d at 313. The Fifth Circuit held that defendant's convictions on Counts Three through Eight were multiplicitous to those on Counts One and Two and reversed those convictions. *Id.* at 318. The Court also suggested that the convictions on Counts One and Two might be multiplicitous with respect to one another, but did not reach the point, since defendant received concurrent sentences on them and did not appeal his convictions on those counts. *Id.* Defendant did not challenge as multiplicitous his conviction on a "second, or separate, charged § 1344 scheme . . . concerning in-

stitutions other than" the S & L involved in the first bank fraud scheme. *Id.* at 313.

In *Poliak,* the Ninth Circuit considered a defendant charged with ten counts of bank fraud. Defendant set up three separate fictitious businesses and opened three checking accounts at three banks. He then executed a check kiting operation involving these three accounts over a two week period. The indictment alleged drawing ten checks, each being identified in a separate count alleging violation of § 1344. Defendant contended that the statute required that these counts be merged into a single scheme of bank fraud. The Ninth Circuit rejected that argument, holding that the language of § 1344 "allows charging each execution of the scheme to defraud as a separate act." The court regarded each of the ten separate checks as "a different and separate execution of the scheme to defraud the banks."

In *Schwartz* the Third Circuit considered a defendant charged with depositing checks drawn on accounts with insufficient funds. The indictment contained three counts, each count referring to a separate check. Defendant was acquitted on count one but convicted on counts two and three. He contended that he should be subject to only a single sentence on the second and third counts. The Third Circuit disagreed, holding that "each deposit was a separate violation of 18 U.S.C. § 1344(a)(1), because in making each deposit Schwartz was executing his scheme to defraud [the bank]." 899 F.2d at 248. The Third Circuit in *Schwartz* relied upon and cited *Poliak.*

As noted, there appears to be no Second Circuit authority on the issue. The Second Circuit did not reach the multiplicity point in *Jones/Blackmon.* The government says that in *Stavroulakis* the Second Circuit affirmed convictions "for two counts of bank fraud based upon two sales of stolen checks that were part of the single scheme." Main Brief at 15. But the indictment in *Stavroulakis* charged two separate schemes in two separate counts, each involving a different bank.

In the case at bar, I conclude that the execution of six separate extensions of the

loan agreement is fatal to defendant's claim of multiplicity. Defendant's argument would be stronger if each of the government's § 1344 counts arose out of drawings of funds by the Arochem Companies under the original loan agreement. That would bring the case squarely within the Fifth Circuit's rationale in *Lemons,* although I am not certain that *Lemons* can be fully reconciled with *Poliak* and *Schwartz.* However, the extensions destroy the analogy. The original line of credit was for a limited period of time. So was each extension. At the end of those periods of time, the borrowers had to ask and the lenders had to agree that the Companies' access to credit be renewed. Presumably the banks did not agree automatically or unthinkingly. The superseding indictment sufficiently alleges what common sense would suggest: the banks, in agreeing to the extensions of the loan agreement, considered and relied upon the information furnished by and on behalf of the Arochem Companies for which the banks had specifically bargained. Defendant says that the original loan agreement was a wordier and more complex document than the succeeding extension agreements. I do not think that matters in the least. Each separate extension of the original loan agreement was a separate execution of the charged scheme to defraud the banks. The pragmatic truth of that proposition lies in the fact that if the banks had refused the first extension, or the second, or the third, or any of them, they would presumably have been defrauded of less money than the total as it stood on the day when the banks came to their senses, stopped granting extensions of the loan, and threw the companies into bankruptcy.

Defendant's motion to dismiss Counts Two through Eight as multiplicitous is denied.[1]

### C. The Wire Fraud Counts

■ Counts Ten through Twenty–One charge defendant with violating the wire fraud statute, 18 U.S.C. § 1343, which provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,-000 or imprisoned not more than 30 years, or both.

The government's wire fraud charges arise in the following context, as alleged in the superseding indictment. When the Arochem Companies accessed the working capital revolving credit facility extended by the Chase group of banks, the monies were deposited in the Arochem Companies' accounts maintained at the Chase Manhattan Bank. The wire fraud counts charge defendant with causing money transfers from those Chase accounts to the Arochem Companies' operating account at the Union Trust Company in Connecticut, and from there to the Swiss accounts of defendant's wholly-owned company, Limited. As noted, ¶ 21 of the superseding indictment alleges that the monies held by the Arochem

---

1. The viability of the bank fraud counts disposes of defendant's motion to dismiss Count Nine, the money laundering count. Defendant did not originally move to dismiss that count, although it was included in the original indictment. The money laundering statute, 18 U.S.C. § 1956(a)(2)(B)(i), prohibits the transfer of funds representing the proceeds of unlawful activity with the purpose of concealing or disguising the nature, location, source and ownership of the proceeds. The charged unlawful activity is bank fraud in violation of § 1344; and the alleged money laundering consists of the transfers of funds alleged in Counts Ten through Twenty–One. Consistent with his other arguments, defendant contends that Count Nine should be dismissed because the underlying allegations of bank fraud and wire fraud are insufficient in law. Having reached a contrary conclusion, *see also* discussion of the wire fraud counts, *infra,* I deny defendant's motion to dismiss Count Nine.

Companies at Chase Manhattan Bank were the "proceeds" of the credit agreement, "and as such, were monies due to be repaid to the Chase group of banks at the conclusion (or default) of the loans." The indictment further alleges that by transferring these funds, the defendant concealed from the Chase group of banks the extent to which he was utilizing Limited to finance cargoes in transit and trading activities. *Id.* at ¶¶ 19, 20. Counts Ten through Twenty–One charge 12 separate transfers of monies from Chase Manhattan Bank to Union Trust Company. The transfers total $7.5 million.

Defendant contends that Counts Ten through Twenty–One do not sufficiently allege a fraud against the consortium of lending banks. First, defendant argues that the transfers' practical effect of putting the lending banks "at financial risk," as urged by the government (*see* government's main brief at 19–20), is insufficient in law under *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and its progeny. *McNally*, construing the identically worded mail fraud statute, 18 U.S.C. § 1341, read it "as limited in scope to the protection of property rights." 483 U.S. at 360, 107 S.Ct. at 2882. The Court rejected the government's theory that the mail fraud statute extended to a self-dealing patronage scheme which defrauded the citizens and government of Kentucky of the intangible right to have public affairs conducted honestly. Defendant at bar argues that under *McNally* "an allegation that a future loan repayment was 'at risk' or 'in jeopardy' is not an allegation of a scheme to defraud 'one in his property rights.'" Defendant's reply brief at 13.

Defendant also relies upon *United States v. Regan*, 713 F.Supp. 629, 636–37 (S.D.N.Y.1989), in which Judge Carter cited *McNally* and *United States v. Carpenter*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1988), in concluding that "the harm or injury contemplated or intended must be a monetary or property interest of the victim." Accordingly Judge Carter held that the mail fraud statute did not reach a scheme to defraud a corporation of its intangible right to receive accurate information from a financial advisor.

Defendant also relies upon *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987), in which the Seventh Circuit held that a tax attorney's advice to his clients, which the government alleged deprived the Treasury Department of accurate and truthful information and data necessary to compute income taxes, *id.* at 626, did not fall within the mail and wire fraud statutes because there was no allegation, and the jury was not required to find, "that the scheme resulted in the government being deprived of money or property." *Id.* at 627.

Second, the defendant contends that the superseding indictment does not allege that any fraudulent statements or representations were made with respect to these particular money transfers, nor that the transfers were fraudulent themselves or accomplished by means of fraud. These are also regarded as legal insufficiencies undermining the wire fraud counts.

The superseding indictment at bar adequately alleges violations of the wire fraud statute. The *McNally* problem does not arise in this case. The broad statements in *McNally* and the cases following it should not be lifted out of context. The government does not charge Harris with depriving the lending banks of some intangible right, such as honest services, sound advice, or useful information. The government charges Harris with devising a fraudulent scheme to separate the banks from that quintessential tangible form of property, their money, and causing wire communications to be transmitted in furtherance of the scheme. Just as *McNally* has nothing to do with such a scheme, that case's legislative overruling in 1988 by the enactment of 18 U.S.C. § 1346 adds nothing to the analysis of the case at bar. Nor does *United States v. Evans*, 844 F.2d 36 (2d Cir. 1988), assist Harris. *Evans* followed *McNally* in holding that the government's right to control future arms sales was not a property right sufficient to sustain charges of mail and wire fraud. That hold-

ing cannot be usefully analogized to a bank's interest in its own funds.

Defendant stresses that at the times of these transfers of funds, the lending banks' losses still lay in the future. Accepting that proposition *arguendo*, it makes no difference.

■ A scheme to defraud is an essential element of the crimes of mail and wire fraud, and the government must allege and prove that the defendant possessed a fraudulent intent. But the government need not prove "that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim." *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir.1991). These principles require a nexus between the fraud and the contemplated harm. In *Schwartz* the Second Circuit went on to say that "the deceit practiced must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck." *Id.* The mail and wire fraud statutes are not violated if "the defendants' false representations were collateral to the bargain and did not cause any discrepancy between benefits reasonably anticipated and actual benefits received." *Id.* In such a case, the deceit does not go "to an essential element of the bargain." *Id.* On that basis the Second Circuit in *Schwartz* at 420 distinguished *United Stats v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir.1970) ("the defendants made false representations to gain access to potential customers' purchasing agents, but they did not lie about the quality of their merchandise or falsely make promises or assurances in response to demands made by their customers as conditions for the sale"), and *United States v. Starr*, 816 F.2d 94 (2d Cir.1987) ("The scheme only defeated their customers' expectation that the money they paid to the defendants would be fully used to pay for postage, an expectation that was not the basis of the bargain.")

In the case at bar, the Arochem Companies' ability and intent to repay the monies borrowed from the banks clearly lie at the heart of the bargain. If, as *Schwartz* holds, the government need not allege or prove that the intended victim of the fraud was actually harmed, then *a fortiori* it makes no difference that the lending banks may not have suffered their full $150 million loss until some time after some or all of these particular transfers took place.

■ The wire fraud counts also sufficiently allege that these transfers of monies, representing loan proceeds, from the accounts of the borrowing companies to Limited's accounts in Switzerland were acts in furtherance of the scheme to defraud. Defendant argues in his Final Reply Brief at 5 that the counts "do not allege that the transfer of funds was accomplished by means of any fraud." This makes no difference. The wire fraud statute does not require that the particular communication be fraudulent in and of itself. Once a scheme to defraud is proven, "any writings" communicated by wire "for the purpose of executing such scheme" violate the statute.

Defendant's motion to dismiss Counts Ten through Twenty–One of the superseding indictment is denied.

## D. The Continuing Financial Crimes Enterprise

In Count Twenty–Two the government charges defendant with conducting a continuing financial crimes enterprise, in violation of 18 U.S.C. § 225, which provides:

(a) Whoever—

(1) organizes, manages, or supervises a continuing financial crimes enterprise; and

(2) receives $5,000,000 or more in gross receipts from such enterprise during any 24–month period,

shall be fined not more than $10,000,000 if an individual, or $20,000,000 if an organization, and imprisoned for a term of not less than 10 years and which may be life.

(b) For purposes of subsection (a), the term "continuing financial crimes enterprise" means a series of violations under section 215, 656, 657, 105, 1006,

1007, 1014, 1032, or 1344 of this title, or section 1341 or 1343 affecting a financial institution, committed by at least 4 persons acting in concert.

Harris contends that the statute is unconstitutionally vague, both on its face and as applied to him.

■ Defendant's first brief, arguing for facial vagueness, suggested a number of hypothetical circumstances. I do not reach them. In the absence of First Amendment considerations (and there are none here), "vagueness challenges must be evaluated based on the particular application of the statute and not 'on the ground that [the statute] may conceivably be applied unconstitutionally to others in situations not before the Court.'" *United States v. Coonan,* 938 F.2d 1553, 1562 (2d Cir.1991) (quoting *New York v. Ferber,* 458 U.S. 747, 767, 102 S.Ct. 3348, 3359, 73 L.Ed.2d 1113 (1982)); *see also United States v. MacKenzie,* 777 F.2d 811, 816 (2d Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986).

The question therefore is whether the continuing financial crimes enterprise statute is unconstitutionally vague as applied to the conduct of Harris as described in the superseding indictment.

■ "To determine whether a statute is unconstitutionally vague as applied, the Supreme Court has articulated a two-part test: the court must first determine whether the statute 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and then consider whether the law 'provide[s] explicit standards for those who apply [it].'" *United States v. Schneiderman,* 968 F.2d 1564, 1568 (2d Cir.1992) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972)) (footnote omitted)).

■ Defendant argues that § 225 is void for vagueness as applied to him because it failed to provide him "with adequate notice that obtaining a single credit agreement and extensions of that agreement would constitute a continuing financial crimes enterprise and that this conduct would allow the government to charge him with an additional, separate crime." First Reply Brief at 18. Thus the main thrust of defendant's vagueness argument falls upon the definition of a "continuing financial crimes enterprise" contained in § 225(b), namely, "a series of violations" under specified sections of Title 18. Defendant argues:

> The indictment alleges a single scheme to defraud a consortium of banks in connection with a single credit agreement, which was extended six times during a period of less than two years. It is simply not conceivable that the defendant was on notice that the single fraudulent scheme alleged in this indictment could constitute the "series of violations" required by [the continuing financial crimes enterprise statute.]

*Id.* at 24.

The first prong of the vagueness inquiry is often surreal. It presupposes that the accused, having formulated in his mind the course of conduct described in the indictment, then reads the section of the penal law under which he is subsequently charged to determine the legality of his acts. That contemplative exercise may occur on occasion, but I doubt that it does so often, and particularly doubt that it occurred in this case. That is to say, I think it unlikely that Harris considered the terms of 18 U.S.C. § 225 and decided that his conduct would not violate it.

Nevertheless, constitutional vagueness analysis requires the assumption that people act that way. *Coonan* contains a typical statement at 938 F.2d at 1562: "Thus, to succeed on his vagueness challenge, Kelly must demonstrate that the statute, as applied, failed to adequately warn of the prohibited conduct." What courts do in such cases is assume that the accused read the statute before acting, although it is most unlikely that he did. To borrow a phrase from another area of the law, the accused is considered to have constructive knowledge of the statute's prohibition, and to have that knowledge prior to the charged conduct. I also think it right to say that the accused's constructive knowledge extends to judicial interpretations of

the statute. It is of course just as fanciful to suggest that the accused consulted the annotations after reading the statute; but constitutional vagueness analysis begins with the inquiry of whether the statute gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited, and as a practical matter that analysis must include judicial interpretations of the statute in existence at the time of the accused's actions.

Viewing the case in this light, I conclude that the continuing financial crimes enterprise statute gave defendant adequate warning that the charged conduct would fall within its terms. The statute reaches one who "organizes, manages or supervises" the enterprise. § 225(a)(1). These are common words. They clearly describe defendant's role in the alleged scheme. The requirements of Section 225(a)(2), the receipt of $5,000,000 or more in gross receipts during any 24–month period, are readily understandable. As for the key definition of a "continuing financial crimes enterprise" in § 225(b), the phrase "means a series of violations" under a number of specified sections of Title 18, including § 1344 and § 1343.

I have previously concluded that the seven bank fraud counts are not multiplicitous, and the 12 wire fraud counts sufficiently allege violations of that statute. Those conclusions also require the conclusion, for purposes of constitutional vagueness analysis, that § 225 gave defendant adequate warning that his conduct would violate its provisions.

As for the second prong of the vagueness inquiry, I think that § 225 provides sufficient guidance to prohibit its arbitrary or discrimination by law enforcement officers. The statute requires the government to persuade a grand jury that the accused "organizes, manages, or supervises" the enterprise. § 225(a)(1).

These commonly used words limit the sorts of persons who may be prosecuted under the statute, as do the limitations in § 225(a)(2), which require that the accused receive $5,000,000 or more in gross receipts from the enterprise during a 24–month period.[2] § 225(b) contains a definition of "continuing financial crimes enterprise" which limits prosecutors to cases where they can show (1) a "series of violations" (2) under specified sections of Title 18(3) "affecting a financial institution" and (4) committed by at least four persons acting in concert. These limitations constitute in large measure "objective criteria against which to measure possible violations of the law." *Schneiderman,* 968 F.2d at 1568.

Defendant at bar professes to find these limiting phrases imprecise and indefinite. I do not agree; and it is difficult to conclude that the government is invoking § 225 in an arbitrary or discriminatory manner in the case at bar, where the chief executive officer of companies is accused of seven separate executions of a scheme to defraud a financial institution, and 12 violations of the wire fraud statute in furtherance of that scheme, during a specified twenty-four month period.

No court appears to have considered the constitutionality of the continuing financial crimes enterprise statute, which was enacted on November 29, 1990. But the Second Circuit upheld the constitutionality of the closely analogous continuing criminal enterprise statute, 21 U.S.C. § 848(b), against a challenge for vagueness in *United States v. Manfredi,* 488 F.2d 588, 602–03 (2d Cir. 1973). § 848(a) imposes severe penalties upon a "person who engages in a continuing criminal enterprise." § 848(b) defines "a person ... engaged in a continuing criminal enterprise" as one who violates specified provisions of Title 21, where the violation "is a part of a continuing series of violations" of that Title, undertaken by the person "in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of man-

---

**2.** The $5,000,000 amount and the 24–month period are elements which the government must prove at trial to obtain a conviction under the statute. To the extent that defendant at bar contends that the superseding indictment does not sufficiently allege those elements, I reject the argument.

agement," and "from which such person obtains substantial income or resources."

It will be noted that the statutory scheme of 18 U.S.C. § 225 closely follows that of 21 U.S.C. § 848. The Second Circuit held that § 848 was not unconstitutionally vague as applied to the drug-trafficking defendants involved in *Manfredi:*

> To sustain appellant LaCosa's position would force us to hold that words cannot be devised to make it an offense to engage in the continuous sale and trafficking in heroin with a number of other people and with substantial sums of money changing hands; we feel that not to be the case and that, as applied to the conduct with which Joseph LaCosa was charged, *see Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the statute is not unconstitutionally vague.

*Id.* at 603.

The court of appeals briskly disposed of defendants' argument that in other circumstances the applicability of § 848 might be questionable: "[I]t is irrelevant that a case may be hypothesized where it is difficult to determine whether a particular defendant were engaged in a 'continuing criminal enterprise' under § 848." *Id.*

Defendant at bar seeks to distinguish *Manfredi* on the basis that "the Second Circuit applied a lenient vagueness standard when it considered the constitutionality of 21 U.S.C. § 848." Main Brief at 33. Defendant makes that argument on the basis of the Second Circuit's quotation in *Manfredi* of Justice Douglas's observation on *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972): "In the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed." The Second Circuit then observed: "In this respect § 848 is in a very real sense a regulation—a very severe one, to be sure—of the business of selling drugs." *Id.* at 602.

I find nothing to comfort defendant in all of this. Just as 21 U.S.C. § 848 is a "regulation" of the business of selling drugs, so 18 U.S.C. § 225 is a "regulation" of doing business with financial institutions. In particular, the statute is intended to "regulate" that business by safeguarding such institutions from theft or fraud. The fact that a number of provisions in Title 18 proscribe such conduct and are incorporated by reference in § 225(b) does not change the nature or purpose of the statute, or serve to distinguish *Manfredi.* The continuing criminal enterprise statute involved in *Manfredi* incorporates by reference violations of any provision of subchapter I of Title 21, or of subchapter II the punishment for which is a felony. § 848(b)(1). While the provisions of these subchapters all deal generally with drugs, they include a considerable variety of prohibited conduct. The variety of conduct embraced by § 225(b) is not different in kind, particularly where applicability of the statute is limited by the government's need to prove a "series of violations ... affecting a financial institution ..." The phrase "series of violations" in 18 U.S.C. § 225(b) also appears in 21 U.S.C. § 848(b)(2). Neither statute further defines the phrase. That did not give rise to a vagueness problem in *Manfredi,* at least on the proven facts of that case. The phrase does not make for a vagueness problem in the case at bar, at least on the facts alleged in the superseding indictment.

Defendant observes that the four concurring justices in *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), "explicitly invited a constitutional vagueness challenge" to the RICO statute. Main Brief at 26; *see* opinion of Scalia, J. concurring in the judgment, 492 U.S. at 255–56, 109 S.Ct. at 2908–09: "No constitutional challenge to this law has been raised in the present case, and so that issue is not before us."

RICO's component parts are differently worded from the continuing financial crimes enterprise statute. Arguably RICO's provisions are more vulnerable to constitutional attack for vagueness, although it must be remembered that Justice Scalia wrote for a minority of the Court in *H.J.* Justice Brennan's opinion commanded a majority of five and contained no

murmurings about constitutionality. In any event, subsequent to *H.J.* the Second Circuit in *Coonan* sustained the constitutionality of the RICO statute against a vagueness challenge. 938 F.2d at 1561–62.

Defendant's motion to dismiss Count Twenty–Two on the ground that the continuing financial crimes enterprise statute, 18 U.S.C. § 225, is unconstitutionally vague is denied.

### E. The Bank of New York Loan

■ Count Twenty–Three of the superseding indictment charges that on or about November 29, 1989, defendant made a false statement for the purpose of influencing the Bank of New York in connection with defendant's application for a personal loan. Specifically, the government charges that defendant submitted a false personal financial statement which failed to disclose a $2.79 million liability arising out of personal loans in that amount "from John J. Moller and USA Petroleum (Bermuda), Ltd." ¶ 24.

The government expands upon these allegations in its reply brief at 19–20. According to the government, in October 1991 Harris received a $2.79 million personal loan from John J. Moller and his company, USA Petroleum (Bermuda), Ltd. The Arochem Companies had engaged in options trading with Moller's company. Harris deposited the proceeds of the Moller loan in his personal account at the Bank of New York. He thereafter attempted to borrow money from the Bank of New York in order to purchase the interest of certain minority Arochem shareholders. The government summarizes the gravamen of Count Twenty–Three in its brief at 20:

> In essence, then, the defendant inflated his assets by the amount of the loan, approximately $2.79 million, and failed to declare the amount of the loan as a liability in order to induce the Bank of New York to extend to him a personal loan that he could use to acquire ownership control of Arochem.

This conduct is alleged to have violated 18 U.S.C. § 1014, which prohibits, *inter alia,* the making of false statements in loan applications to federally insured banks.

Defendant joined this count with the counts relating to the Chase Bank consortium frauds by invoking Rule 8(a), Fed. R.Crim.P., which provides:

> **Joinder of Offenses.** Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Defendant contends that Count Twenty–Three, which I will refer to as the "Bank of New York personal loan fraud," is improperly joined with Counts One through Twenty–Two, which I will collectively refer to as the "Chase Bank consortium corporate loan fraud." Defendant moves under Rule 14 to sever Count Twenty–Three from the other counts for separate trial. Rule 14 provides in pertinent part:

> If it appears that a defendant ... is prejudiced by a joinder of offenses in an indictment ... or by such joinder for trial together, the court may order ... separate trials of counts, ... or provide whatever other relief justice requires.

The government contends that this joinder of counts is justified by Rule 8(a). It says that limited judicial and prosecutorial resources will be conserved by one trial instead of two. In that regard, it argues that two trials would be wasteful of those resources because, even if Count Twenty–Two were severed, the facts surrounding the Bank of New York personal loan fraud would be provable at the trial of the Chase Bank consortium corporate loan fraud under Rule 404(b), Fed.R.Evid.

These matters rest in the trial court's discretion. In the exercise of that discretion, I sever Count Twenty–Three from the trial of the superseding indictment, and rule *in limine* that proof of that count's underlying facts is not admissible at the trial of the other counts.

Contrary to the government's conclusory assertions, the Bank of New York private loan fraud bears no discernible, let alone meaningful, connection to the Chase Bank consortium corporate loan fraud. Harris wished to borrow money from the Bank of New York to buy out minority sharehold-ers of the Arochem Companies. The Com-panies entered into the credit arrangement with the Chase consortium to finance their operations. Quite apart from the fact that different banks and different times of bor-rowing are involved, there is no indication that Harris's private objective (acquiring the minority shares) was related to the corporate objective (making money on oper-ations). There is no allegation that John J. Moller and USA Petroleum (Bermuda), Ltd., who made the personal loans to Har-ris that the latter concealed from the Bank of New York, had anything to do with negotiation of the Chase Bank consortium line of credit, or defendant's alleged fraud in connection with that entirely separate transaction. There is no allegation that Harris's conduct in defrauding the Bank of New York related in any way, directly or indirectly, to his subsequent conduct *vis-a-vis* the Chemical Bank consortium.

Accordingly it cannot be said that Count Twenty–Three is "based on the same act or transaction" as the other felonies charged, or that Count Twenty–Three together with the preceding counts constitute "two or more acts or transactions connected togeth-er or constituting parts of a common scheme or plan," those being two of the three specified bases for joinder of of-fenses under Rule 8(a). In consequence, the government is left to argue that the felony counts "are of the same or similar character", that being the remaining basis for joinder.

Harris's conduct as alleged in Count Twenty–Three is "similar" to his conduct alleged in the other counts only in the broadest sense of the word. Surely that conduct is not the "same." Omitting a liability from an application for a loan to one bank for a personal loan is not the "same" act as submitting falsified corpo-rate operating reports to another bank to obtain the issuance and periodic renewals of a line of credit. The conduct is of "simi-lar character" only in the sense that each involved fraud and had the objective of persuading a bank to lend its money.

Even if it be assumed that the charged felonies are of the "same or similar charac-ter," that is the weakest basis for joinder of offenses. In *United States v. Halper*, 590 F.2d 422, 430 (2d Cir.1978), the Second Circuit said:

When all that can be said of two separate offenses is that they are of the "same or similar character," the customary justifi-cations for joinder (efficiency and econo-my) largely disappear.

But the risk to the defendant of unfair prejudice, through confusion of the issues or cumulative use of evidence by the jury, is heightened. Thus *Halper* held that Rule 8(a) was violated to defendant's prejudice when a Medicaid fraud indictment arising from defendant's failure to ensure that his laboratory engaged in honest billing prac-tices was joined for trial with an income tax evasion indictment.[3] The government relies upon the Second Circuit's statement in *United States v. Gordon*, 655 F.2d 478, 484 (2d Cir.1981), "that 'too precise an iden-tity between the character of the offenses' charged in one indictment should not be required" (citing and quoting *United States v. Werner*, 620 F.2d 922, 926 (2d Cir.1980)). But the facts in *Gordon* are inapposite. The Second Circuit made the quoted statement in the context of an in-dictment containing eight counts of mail fraud and one count of interstate transpor-tation of stolen property. The court of appeals rejected defendant's contention of

---

**3.** The district court in *Halper* ordered the two indictments tried together under Rule 13, which provides in relevant part:

The court may order two or more indictments to be tried together if the offenses ... could have been joined in a single indictment.

For that determination, "reference is necessarily made to Rule 8(a) of the Federal Rules of Crimi-nal Procedure ..." 590 F.2d at 428. According-ly, although *Halper* arose on a post-conviction appeal of the trial judge's Rule 13 order, the Second Circuit's analysis focuses upon Rule 8(a).

impermissible Rule 8(a) joinder "because the acts of mailing charged in the first eight counts form part of a 'common and continuous scheme and plan ...' (quoting the district court). In each of these counts Gordon was alleged to have abused his position as a financial advisor for the purpose of defrauding his clients." *Id.* at 484. "Moreover," the Second Circuit continued, "Gordon's representations to the individuals named in the indictment were similar in nature; in each case he promised to invest money in certificates of deposit or other property." *Id.* at 485. In the case at bar, Harris' conduct in relation to the Bank of New York, occurring prior in time, in no way forms part of a "common and continuous scheme and plan" in relation to his conduct affecting the Chase Bank consortium. Nor is that conduct similar in nature to the extent presented by *Gordon.*[4]

*Gordon* also affirmed the district court's joinder for trial under Rule 13 of the first indictment with a second indictment charging defendant with the making of a materially false statement in a loan application and with the interstate transportation of stolen property. Again, the facts in *Gordon* were different, both from *Halper, supra,* and the case at bar. Thus the Second Circuit said in *Gordon* at 485:

> Here, unlike *Halper,* there is a clear connection between the acts charged in the two indictments. Our examination of the record satisfies us that Judge Foley was correct in finding that "the alleged transactions upon which the charges in the second indictment are based do intertwine and connect together with transactions in several counts of the first so as to constitute part of a common scheme to obtain moneys by fraud." *[U.S. v. Gordon,] (Gordon II) supra,* 493 F.Supp. [814] at 821 [(N.D.N.Y. 1980)]. We agree that the considerations favoring

consolidation outweighed the prejudice to the defendant.

*Halper* recognizes that "the Rule 8(a) rubric of 'same or similar character' has been upheld where evidence of one offense would be admissible in a separate trial on the other offense as evidence of 'other crimes wrongs, or acts.'" 590 F.2d at 431. In the case at bar, the government contends that the facts underlying Count Twenty–Three would be admissible at the trial of the other counts under Rule 404(b) F.R.Evid., which provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

From this evidentiary proposition the government concludes that the counts should be tried together.

The argument fails because proof of the Bank of New York individual loan fraud would not be admissible under Rule 404(b) at trial of the Chase Bank consortium corporate loan fraud. To be admissible under the rule, prior acts must be similar acts. The adjective "similar" does not appear in the rule, but the courts universally recognize the requirement, which is grounded in the concept of relevance. *See, e.g., Huddleston v. United States,* 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988): "The actor in this case was a criminal defendant, and the act in question was 'similar' to the one with which he was charged." If the other conduct is not sufficiently similar to the charged conduct, its admission may constitute reversible error.

That principle is illustrated by *United States v. Afjehei,* 869 F.2d 670, 674 (2d

---

**4.** *In United States v. Werner, supra,* arising out of robberies from the Lufthansa cargo warehouse at John F. Kennedy Airport, the Second Circuit distinguished *Halper* and held that offenses "of the same or similar character" were properly joined where "[b]oth were accomplished by Werner's exploitation of his knowledge of the airline's cargo handling procedures.

The success of the first theft stimulated Werner to be on the alert to commit another much larger one. Werner approached his confederates in the first crime to aid him in the second, paid one of them for his silence, and considered investing part of the loot with the other." 620 F.2d at 926. The case at bar more closely resembles *Halper* than *Gordon* or *Werner.*

Cir.1989), a narcotics case in which the Second Circuit held that evidence of prior trips by the defendant constituted reversible error under Rules 404(b) and 403. The court of appeals said at 674:

> [E]vidence of another act should not be admitted to show knowledge unless the other act is "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge inference advocated by the proponent of the evidence." *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir.1987). "Similarity, being a matter of relevancy, is judged by the degree in which the prior act approaches near identity with the elements of the offense charged. There is no necessity for synonymity but there must be *substantial* relevancy...." *United States v. Kasouris*, 474 F.2d 689, 692 (5th Cir.1973) (emphasis in original); *but see* 2 *Weinstein's Evidence* ¶ 404[12], at 404–90 to 404–91 (1988) (suggesting that trial court is given especially broad discretion to view acts as similar in narcotics cases). If the other-act evidence does not provide a reasonable basis for inferring knowledge, its offer for that purpose should be rejected on grounds of relevance.

As *Afjehei* goes on to hold, even if the trial court concludes that other-act evidence is sufficiently similar to be relevant (which I decline to do in the case at bar), it must still perform the balancing analysis envisioned by Rule 403, which allows the court to exclude relevant evidence if its probative value is substantially outweighed by its potential for unfair prejudice. The Second Circuit continued:

Though a ruling under Rule 403 is reviewed under the abuse-of-discretion standard, we have found it such an abuse to admit similar act evidence if the other act or acts are not sufficiently similar to the conduct at issue, or if the chain of inferences necessary to connect the evidence with the ultimate fact to be proved is unduly long.

*Id.* at 674 (citations omitted).

In the case at bar, I conclude without difficulty that the Rule 403 balance tips against the government in seeking to offer, at the trial of the Chase Bank consortium corporate fraud, evidence relating to the alleged Bank of New York individual loan fraud. The reasons for that conclusion appear sufficiently in the Rule 8(a) analysis, *supra.*

Seeking support in another drug case, the government cites *United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir. 1990), for the proposition that Harris's prior acts relating to the Bank of New York would assist the jury in understanding the facts alleged with respect to the Chase Bank consortium credit agreement. That assertion is entirely conclusory and, given the underlying facts, both unsupported and unsupportable. The circumstances in *Roldan–Zapata* were entirely different: "The pre-existing drug-trafficking relationship between Akiva and Osario–Serva furthered the jury's understanding of how the transaction came about and their role in it." *Id.* at 804.

For the foregoing reasons, Count Twenty–Three will be severed from the trial of the other counts of the superseding indictment, and evidence of its underlying facts will not be admitted at that trial.[5]

5. In a bill of particulars the government stated that the "Arochem Companies' minority shareholders and the companies' independent auditors are alleged to be subsidiary victims of the defendant's fraudulent schemes." The government cited to ¶¶ 7 and 14 of the superseding indictment. ¶ 7 alleges that as part of the Chase bank consortium fraud, the conspirators concealed the true financial condition of the Arochem Companies "from the Chase group of banks and the Arochem Companies' independent auditors...." ¶ 14 alleges that the conspiracy's objective was to defraud "the minority shareholders of Arochem Companies" and the Chase Bank consortium. Defendant moves to "dismiss the companies' minority shareholders and auditors as victims." First Reply Brief at 36. I do not understand defendant's motion. Counts in an indictment may be "dismissed," but neither the auditors nor the minority shareholders are listed as separate victims in a particular count. Perhaps defendant wishes a limiting order before the government opens to the jury, or the indictment to be redacted before it is read to the jury. Decision on this aspect of the case is reserved until counsel make themselves more clear.

Trial of the case will go forward in conformity with this Opinion.

It is SO ORDERED.