UNITED STATES of America,

v.

Kenneth **ASHLEY** and Frank LaGrua, Defendants.

No. 94–CR–1235 (DRH).

United States District Court,
E.D. New York.

Nov. 13, 1995.

Zachary W. Carter, United States Attorney, Eastern District of New York by Mark O. Wasserman, Asst. U.S. Atty., Garden City, New York, for U.S.

Fischetti & Russo by Ronald G. Russo, New York City, for defendant Kenneth Ashley.

Paul A. Batista, New York City, for defendant Frank LaGrua.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

Presently before the Court are motions by Defendant Kenneth Ashley ("Ashley") and Defendant Frank LaGrua ("LaGrua") (collectively, "Defendants") to dismiss or sever various counts of a Superseding Indictment that was filed in April 1995 ("the Indictment"). Defendants also have moved for discovery of specified documents. For the reasons indicated below, the Court grants Ashley's motion to dismiss Counts (6) and Seven (7), and his motion to sever Counts (8) and (9). Defendants' discovery motions are denied.

## BACKGROUND

The Federal Home Loan Mortgage Corporation ("Freddie Mac") "was a corporation ... created by Congress to develop a secondary mortgage market for conventional residential loans." (Indictment ¶ 1.) "As such, Freddie Mac purchased conventional mortgage loans from approved mortgage sellers." (*Id.*) Ashley was the President of Liberty Mortgage Banking Limited ("Liberty"), a corporation licensed by the State of New York as a mortgage bank, and LaGrua was its Sales Manager. (*Id.* ¶¶ 2, 7–8.) The Indictment alleges that Liberty was an approved Freddie Mac mortgage seller from 1987 until mid-October, 1990.[1] (*See id.* ¶¶ 3, 52.)

The Indictment alleges, *inter alia*, that Defendants devised a scheme to defraud Freddie Mac (hereinafter the "Freddie Mac Scheme"). In connection with the alleged Freddie Mac Scheme, Defendants are charged with conspiracy to commit wire fraud, and with the substantive crime of wire fraud. The Indictment also alleges that Ashley devised a scheme to defraud National Westminster Bank, N.A. ("NatWest"), a federally-insured financial institution (hereinafter the "NatWest Scheme"), and that he and unnamed others devised a scheme to defraud First Penn Bank ("First Penn"), also a federally-insured financial institution (hereinafter the "First Penn Scheme"). Ashley is charged with wire fraud in connection with the alleged NatWest Scheme and with conspiracy and bank fraud in connection with the alleged First Penn Scheme. Further,

---

1. "On or about October 17, 1990, Freddie Mac terminated ... [its mortgage purchase agreement] with Liberty for failing to maintain adequate quality control procedures and failing to report internal quality control findings that could have affected the investment quality of the mortgages Freddie Mac had purchased." (Indictment ¶ 52.) Approximately one month later, Liberty and Ashley, as well as Yoel Movtady, the vice president of Liberty, (*see* Nov. 30, 1994 Indictment ¶ 8), filed a civil suit against Freddie Mac in the Eastern District of New York (hereinafter "the Liberty Civil Case") alleging, *inter alia*, that Freddie Mac had wrongfully breached the mortgage purchase agreement between itself and Liberty. (*See* Indictment ¶ 53.)

the Indictment charges Defendants with conspiring to commit perjury and suborning perjury in connection with depositions in the Liberty Civil Case. Finally, LaGrua is charged with perjury in connection with his deposition testimony in the Liberty Civil Case.

LaGrua has moved to dismiss each count of the Indictment that names him as a defendant. In the alternative, he has moved for severance of his trial from Ashley's and asks that the Government be directed to provide pre-trial disclosure of specified documents. Further, LaGrua moves for an Order compelling the Government to provide immediate notice of "other act" evidence.

Ashley has moved to have his trial on the perjury charges and the charges relating to the alleged Freddie Mac Scheme severed from his trial on the remaining charges against him. Further, Ashley has moved to dismiss Counts Six (6) and Seven (7) of the Indictment, which relate to the alleged NatWest Scheme. Ashley has also moved for an Order directing the Government to produce certain specified documents. Finally, Ashley requests "leave to join in all motions of his co-defendant as they may apply to Ashley."

As a preliminary matter, the Court notes that the Government does not oppose Ashley's request to join in the motions of LaGrua to the extent that those motions inure to Ashley's benefit; the Court hereby grants that request by Ashley. As to the remaining motions by Defendants, the Court first considers their motions to dismiss, secondly their severance motions, and finally, Defendants' discovery motions.

## DISCUSSION

### I. *Motions to Dismiss Indictment*

Federal Rule of Criminal Procedure 7(c)(1) provides, in relevant part, as follows:

The indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. It shall be signed by an attorney for the government. It need not contain a formal commencement, a formal conclusion or any other matter not necessary to such statement. Allegations made in one count may be incorporated by reference in another count. It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means. The indictment . . . shall state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated.

Fed.R.Crim.P. 7(c)(1).

▆ This rule performs three constitutional functions: (1) pursuant to the Sixth Amendment, it insures that the defendant is informed of the "nature and cause of the accusation;" (2) pursuant to the Fifth Amendment, it prevents any person from being "subject for the same offense to be twice put in jeopardy of life or limb;" and (3) pursuant to the Fifth Amendment, it prevents a defendant from being held "to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a Grand Jury." *United States v. Upton,* 856 F.Supp. 727, 738 (E.D.N.Y.1994) (citations omitted).

▆ "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992) (citing *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962) and *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.) ("An indictment need only provide sufficient detail to assure against double jeopardy and state the elements of the offense charged, thereby apprising the defendant of what he must be prepared to meet.") (citation omitted), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975)).

▆ The Second Circuit has "often stated that 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.' "

*Id.* (quoting *Tramunti,* 513 F.2d at 1113) (further citations omitted). However, "when the definition of an offense includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars." *Id.* (citing *Russell,* 369 U.S. at 765, 82 S.Ct. at 1047) (internal quotations and further citations omitted). In other words, an indictment must "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Upton,* 856 F.Supp. at 738 (citing *Russell,* 369 U.S. 749, 82 S.Ct. 1038).

### A. Count One (1)

Count One (1) of the Indictment charges Defendants with conspiracy in connection with the alleged Freddie Mac Scheme. 18 U.S.C. § 371 ("Section 371"); 18 U.S.C. § 3551 (Sentencing Reform Act of 1984).

The conspiracy statute, Section 371, provides in pertinent part as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined ... or imprisoned ... or both.

18 U.S.C. § 371.

■ Section 371 prohibits two types of conspiracies: a conspiracy "to commit any offense against the United States;" and a conspiracy "to defraud the United States, or any agency thereof." *See, e.g., United States v. Rosenblatt,* 554 F.2d 36, 40 (2d Cir.1977). The Government has not alleged that Freddie Mac is an agency of the United States within the purview of Section 371. Thus, the issue presently before the Court as to Count One (1) is whether or not it sufficiently charges a conspiracy to commit an offense against the United States.

■ "It has long been established that the words 'offense against the United States' encompass all offenses against the *laws* of the United States, not just offenses directed at

the United States as target or victim." *United States v. Gibson,* 881 F.2d 318, 321 (6th Cir.1989) (emphasis added) (citing *Radin v. United States,* 189 F. 568, [571] (2d Cir.1911)) (further citations omitted); *see also United States v. Brandon,* 17 F.3d 409, 422 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 80, 130 L.Ed.2d 34 (1994). Wire fraud is prohibited by a law of the United States. *See* 18 U.S.C. § 1343 ("Section 1343"). Thus, a conspiracy to commit wire fraud is prohibited by Section 371. *See, e.g., United States v. Piervinanzi,* 23 F.3d 670, 674 (2d Cir.), *cert. denied,* —— U.S.——, 115 S.Ct. 259, 130 L.Ed.2d 179 (1994).

The federal wire fraud statute, Section 1343, provides as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.

■ Count One (1) of the Indictment alleges, *inter alia,* as follows:

> In or about and between March of 1990 and December of 1992, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants KENNETH ASHLEY and FRANK LAGRUA and others did knowingly and willfully conspire to devise a scheme and artifice to defraud Freddie Mac and to obtain money and property from Freddie Mac by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing said scheme and artifice caused to be transmitted, by means of wire in interstate commerce, writings, signs and signals, in

violation of Title 18, United States Code, Section 1343.

(Indictment ¶ 12.) Details as to the alleged scheme and conspiracy are then provided. (*See id.* ¶¶ 13–23.) Further, the Indictment specifies eight (8) overt acts that it is alleged were committed by Defendants and their co-conspirators in furtherance of their conspiracy to commit wire fraud. (*See id.* ¶ 23.)

"The Supreme Court has held that ... a [conspiracy] count need only 'identify the offense which the defendants conspired to commit ...', and that it need not 'with technical precision, state all the elements essential to the commission of the [substantive] crimes ...'" *United States v. Messina,* 481 F.2d 878, 880 (2d Cir.) (quoting *Williamson v. United States,* 207 U.S. 425, 447, 28 S.Ct. 163, 171, 52 L.Ed. 278 (1908)), *cert. denied,* 414 U.S. 974, 94 S.Ct. 286, 38 L.Ed.2d 217 (1973); *see also United States v. Mitchell,* 372 F.Supp. 1239, 1253 (S.D.N.Y.) ("An indictment charging the essential elements of a conspiracy need not allege with particularity the means by which the substantive crime alleged to be the object of the conspiracy was to be accomplished.") (citations omitted), *appeal dismissed,* 485 F.2d 1290 (2d Cir.1973). Count One (1) of the Indictment clearly identifies that Defendants are charged with conspiracy to commit wire fraud.

■ Further, it is clear from a juxtapositioning of Count One (1) against Section 371 that it tracks the language of the statute charged and states the approximate time and place of the alleged crime. *See Stavroulakis,* 952 F.2d at 692. Additionally, Count One (1), (*see* Indictment ¶¶ 13–23), provides specific facts regarding the alleged conspiracy. *See United States v. De Sapio,* 299 F.Supp. 436, 444–45 (S.D.N.Y.1969); *see also Upton,* 856 F.Supp. at 740. In short, the Indictment charges a conspiracy by Defendants and unnamed others to commit wire fraud, in violation of Section 371, "with sufficient precision to inform the defendant[s] of the charges [t]he[y] must meet and with enough detail

that [t]he[y] may plead double jeopardy in a future prosecution based on the same set of events." *See Stavroulakis,* 952 F.2d at 692; *see also United States v. Bonanno,* 177 F.Supp. 106, 113 (S.D.N.Y.1959) ("In effect, it is merely necessary that the elements of a conspiracy be set forth with sufficient particularity for the defendants to understand what they are charged with having conspired to do."). Thus, the Court denies Defendants' motions to dismiss Count One (1) of the Indictment.[2]

### B. Counts Two (2) through Five (5)

Counts Two (2) through Five (5) charge Defendants with the substantive crime of wire fraud in connection with the alleged Freddie Mac Scheme. 18 U.S.C. § 1343; 18 U.S.C. § 2 (federal aiding and abetting statute); 18 U.S.C. § 3551. These counts allege, in part, as follows:

> On or about the dates set forth below, all dates being approximate, within the Eastern District of New York and elsewhere, the defendants listed below and others, having devised a scheme and artifice to defraud Freddie Mac and to obtain money by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting to do so, caused to be transmitted by means of wire communications in interstate commerce, signs, signals and sounds, to wit: wire transfers of cash and negotiable securities from Freddie Mac to Liberty in payment for mortgage loans....

(Indictment ¶ 25.) The Indictment provides specific facts—names of Defendants, loan numbers, and approximate dates—as to four (4) such wire transfers. (*Id.* ¶ 28.) Finally, these counts incorporate, by express reference, (*see id.* ¶ 24), details as to the alleged Freddie Mac Scheme. (*See id.* ¶¶ 13–23.)

Again, Section 1343 provides as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud,

---

**2.** LaGrua's arguments *vis-a-vis* the sufficiency of Count One (1) are based upon the sufficiency of the substantive wire fraud charges. (*See* LaGrua Mem.Supp. 2–16.) However, as previously indicated, a conspiracy count need not state precise-

ly all the elements of the substantive crime. *See supra* at 1153–1154. In any event, the Court addresses those arguments by LaGrua in the next section of the instant Order.

or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.

■ "Although largely overlapping, a scheme to defraud, and a scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, are separate offenses." *United States v. Cronic*, 900 F.2d 1511, 1513 (10th Cir.1990) (mail fraud) (collecting cases); *United States v. Clausen*, 792 F.2d 102, 104 (8th Cir.) ("Courts have construed ... [Section 1343] to forbid *both* schemes to defraud, whether or not any specific misrepresentations are involved, *and* schemes to obtain money or property by means of false or fraudulent pretenses, representations, or promises.") (emphases in original) (collecting cases), *cert. denied*, 479 U.S. 858, 107 S.Ct. 202, 93 L.Ed.2d 133 (1986); *see also United States v. Margiotta*, 688 F.2d 108, 121 (2d Cir.1982) ("[T]he prohibition against schemes or artifices to defraud is properly interpreted to be independent of the clause 'for obtaining money or property.' ") (mail fraud) (citations omitted), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

■ To properly allege wire fraud *vis-a-vis* a scheme to defraud, the Government must demonstrate (1) a scheme to defraud; (2) to obtain money or property; and (3) use of the interstate wires to further the scheme. *See United States v. Teyibo*, 877 F.Supp. 846, 860 (S.D.N.Y.1995) (citations omitted). The offense of such a scheme "focuses on the intended end result." *Cronic*, 900 F.2d at 1513. In contrast, to properly allege wire fraud *vis-a-vis* a scheme to obtain money, the Government, rather than demonstrate a scheme to *defraud*, must show false

or fraudulent pretenses, representations or promises. *See id.* at 1514. The focus in a scheme to obtain money is on the *means* by which the money was to be obtained. *See id.* As discussed below, the Court finds that Counts Two (2) through Five (5) sufficiently charge Defendants with both a scheme to defraud *and* a scheme to obtain money by false or fraudulent pretenses, representations, or promises.

A juxtapositioning of these counts against Section 1343, *see supra* at 1155, reveals that not only do they track the language of the statute charged and state the time and place (in approximate terms) of the alleged crimes, *see Stavroulakis*, 952 F.2d at 692, but they also provide "facts and circumstances as will inform the accused of the specific offence[s] coming under the general description, with which [t]he[y] ... [are] charged." *See Upton*, 856 F.Supp. at 740 (quoting *Hamling v. United States*, 418 U.S. 87, 117–18, 94 S.Ct. 2887, 2908, 41 L.Ed.2d 590 (1974)).

These facts and circumstances are as follows:

(1) the purpose and nature of the scheme (defrauding Freddie Mac into purchasing mortgage loans that had been obtained by means of false information);

(2) the means by which the objectives of the scheme were carried out (Liberty made certain promises with respect to each loan that it would sell to Freddie Mac, including that the borrower had the willingness and financial ability to pay the loan; Defendants then lined up "false borrowers" to pose as mortgage applicants and caused mortgage loan applications with supporting documents containing false information to be completed and submitted to Liberty and later sold to Freddie Mac); and

(3) the nature of the communications which were used to further the objectives of the scheme (four specified wire transfers).

■ Notwithstanding these allegations, LaGrua argues that the wire fraud counts are insufficient in several ways. First, they do not specifically allege that he "contemplated or intended that Freddie Mac would sus-

tain damage through a deprivation of Freddie Mac's money or property." (LaGrua Mem.Supp. at 7 (citing *United States v. Schwartz,* 924 F.2d 410, 420 (2d Cir.1991) and *United States v. D'Amato,* 39 F.3d 1249, 1259 (2d Cir.1994).))

In *Schwartz,* the Second Circuit stated that "[a]n essential element of the crimes of mail and wire fraud is a scheme to defraud." [3] 924 F.2d at 420; *see also D'Amato,* 39 F.3d at 1256–57. The *Schwartz* court continued that *"[t]o show* a scheme to defraud, the government must *present proof* that defendants possessed a fraudulent intent." 924 F.2d at 420 (citing *United States v. Starr,* 816 F.2d 94, 98 (2d Cir.1987) (emphases added)); *see also D'Amato,* 39 F.3d at 1257 ("Essential to a scheme to defraud is fraudulent intent.") (citations omitted). Thus, LaGrua argues that because the Indictment does not specifically allege that he contemplated or intended that Freddie Mac would be harmed, it is insufficient.

■ The Government acknowledges that to obtain a *conviction* for wire fraud, it must *prove* fraudulent intent. (*See* Gov.Mem. Resp. at 16.) However, as the Government correctly notes, *D'Amato* and *Schwartz* did not address the sufficiency of an *indictment* but, rather, were concerned with the sufficiency of *proof* produced at trial. *See D'Amato,* 39 F.3d at 1256; *Schwartz,* 924 F.2d at 420. In other words, neither case indicated whether or not an indictment that alleges a scheme to defraud must also specifically allege fraudulent intent.[4]

The Court notes that its research on this issue reveals the case of *United States v. Harris,* 805 F.Supp. 166 (S.D.N.Y.1992). That court stated the following:

A scheme to defraud is an essential element of the crimes of mail and wire fraud, and the government must allege and plead that the defendant possessed a fraudulent intent.

805 F.Supp. at 177. The *Harris* court did not cite any support for this statement, nor has *Harris* been cited by any court within this Circuit to suggest that a federal fraud count is insufficient unless, in addition to alleging a scheme to defraud, it specifically alleges that the defendant possessed fraudulent intent. Indeed in a recent case from the Southern District, there was no indication that such an allegation was necessary. *See Teyibo,* 877 F.Supp. at 860 (*supra* at 1155). In light of the foregoing, this Court finds that the indictment at issue is not insufficient for failure to specifically allege fraudulent intent on the part of Defendants.

■ Next, LaGrua asserts that the wire fraud charges fail because they do not allege that "Freddie Mac, the alleged victim, [ ]ever received any of the false information which, as the Superseding Indictment concedes, was provided exclusively to Liberty." (LaGrua Mem.Supp. at 13 (relying on *United States v. Evans,* 844 F.2d 36 (2d Cir.1988).) LaGrua's reliance on *Evans* for such a proposition is misplaced, as that decision did not address the sufficiency of an indictment. Rather, *Evans* dealt with whether or not the Government had adequately shown a scheme to deprive it of "money or property" within the purview of the federal fraud statutes. *See Evans,* 844 F.2d at 39–40 (affirming dismissal of federal fraud counts). Unlike the defendant in *Evans,* Defendants in the case at bar do not—and reasonably could not—argue that the indictment at issue insufficiently alleges a scheme and artifice to defraud and to improperly obtain money or property from Freddie Mac.[5] In short, *Evans* does not

---

**3.** Here, the Court notes that Counts Two (2) through Five (5) of the Indictment, charging wire fraud, allege with specificity a scheme to defraud. In other words, the Indictment sufficiently pleads this "essential element" of wire fraud.

**4.** Relying again upon *D'Amato,* LaGrua also argues that the wire fraud counts should be dismissed because "there are no allegations that any of his conduct went beyond the duties assigned to him as an employee of Liberty." (LaGrua Mem.Supp. at 12.) . The Court finds that

*D'Amato* provides no support for such a proposition.

**5.** Again, the Indictment alleges that Defendants "devised a scheme and artifice to defraud Freddie Mac and to obtain *money* by means of false and fraudulent pretenses, representations and promises...." (Indictment ¶ 25 (emphasis added).) The Indictment also provides details as to the nature of the alleged Freddie Mac Scheme and the methods used in furtherance thereof. (*See id.* ¶¶ 13–23; *see also id.* ¶ 24.)

support LaGrua's argument that the wire fraud charges should be dismissed.[6]

■■■ Finally, LaGrua relies upon *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767–68 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995), to argue that the wire fraud charges fail because there is no allegation that "Freddie Mac in fact sustained an economic loss." (LaGrua Mem.Supp. at 8.) Such an assertion merits little discussion. Suffice to say, the language of Section 1343, as well as case law interpreting that section, clearly indicate that Defendants need not have been successful in their endeavor in order to be charged with wire fraud.[7] *See United States v. Frey,* 42 F.3d 795, 800 (3d Cir.1994) ("[T]he success of the scheme is not relevant in a mail or wire fraud conviction; it is sufficient that the defendant had the intent to defraud.") (citations omitted); *United States v. Kelley,* 929 F.2d 582, 585 (10th Cir.) ("[T]he government does not have to prove that the victim suffered actual pecuniary loss from the scheme.") (bank fraud and mail fraud) (citation omitted), *cert. denied,* 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991); *United States v. King,* 860 F.2d 54, 55 (2d Cir.1988) ("[A]s we have said many times, the validity of a mail fraud conviction does not hinge upon a showing of actual loss by the intended victim.... [8] It is enough that appellant knowingly devised a scheme to defraud and caused the use of the mails in furtherance of the scheme.") (citations omitted and footnote inserted), *cert. denied,* 490 U.S. 1065, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989).

In light of the above, the Court finds that the Indictment sufficiently charges Defendants with wire fraud *vis-a-vis* the alleged Freddie Mac Scheme; thus, the Court denies Defendants' motions to dismiss Counts Two (2) through Five (5) of the Indictment.

## C. *Counts Six (6) and Seven (7)*

Counts Six (6) and Seven (7) charge Ashley with wire fraud in connection with his alleged scheme to defraud NatWest. 18 U.S.C. § 1343; 18 U.S.C. § 2; 18 U.S.C. § 3551. By way of background, the Court notes that the Indictment alleges that "the Federal National Mortgage Association ("Fannie Mae") was a corporation created ... by Congress to develop a secondary mortgage market for conventional residential loans." (Indictment ¶ 27.) "As such, Fannie Mae [like Freddie Mac] purchased conventional mortgage loans from approved mortgage sellers." (*Id.*) "In or about 1984, Liberty became an approved Fannie Mae mortgage seller...." (*Id.* ¶ 28.)

---

6. Similarly, *D'Amato* does not support that argument by LaGrua. From *D'Amato*, LaGrua quotes the following statement: "A person charged with mail fraud ... must intend to injure the person or entity misled—here Unisys, its management, and/or its shareholders—and the person or entity must thus be a specific target of the inaccurate or concealed information." 39 F.3d at 1257. Significantly, LaGrua's ellipsis indicates his omission of the phrase "under the right to control theory." *See id.*
"The 'right to control' has been recognized as a *property* interest that is protected by the mail fraud statute." *United States v. Wallach,* 935 F.2d 445, 462–63 (2d Cir.1991) (citation omitted and emphasis added). "[A]pplication of the theory is predicated on a showing that some person or entity has been deprived of potentially valuable economic information." *Id.* (citation omitted). "Thus, the withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for a mail fraud prosecution." *Id.* (stockholder's "right to control" the corporation and its officers is a property interest protected by mail fraud statute).
The Indictment under attack clearly alleges a scheme to defraud Freddie Mac and to obtain

money from that entity under false pretenses; the Indictment does not charge that Defendants deprived Freddie Mac of any *property* interest such as a "right to control." Thus, the above-quoted language from *D'Amato* is not relevant to the issue of whether or not the instant Indictment sufficiently charges Defendants with wire fraud.

7. *Gelt Funding,* an "appeal rais[ing] issues surrounding the requirements for pleading a private civil cause of action under the Racketeer Influenced and Corrupt Organizations Act," 27 F.3d at 765, does not suggest otherwise. In that *civil* case, the court found that the plaintiff had not sufficiently shown that it had suffered out-of-pocket losses. *Id.* at 768. Again, however, it is well-settled law that *criminal* wire fraud charges may stand even though the defendant was ultimately unsuccessful in his scheme.

8. The Second Circuit has indicated that "[b]ecause the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way." *Schwartz,* 924 F.2d at 416 (citation omitted).

"Liberty obtained a line of credit from NatWest using loans it originated as collateral...." (*Id.* ¶ 30.) "Upon the sale of these mortgage loans to Fannie Mae, Liberty would direct Fannie Mae to make payment to NatWest to satisfy Liberty's credit obligations." (*Id.*) Specifically, Liberty secured a loan of approximately $2.3 million "from NatWest and other lending institutions (hereafter 'The NatWest Loan')." (*Id.* ¶ 35.) "This money was lent to Liberty for the purpose of funding several residential mortgage loans." (*Id.*)

"Liberty agreed to repay the NatWest Loan promptly upon the sale of the loans to Fannie Mae." (*Id.*) The Indictment alleges that Ashley, Liberty's President, "having devised a scheme and artifice to defraud NatWest and to obtain money and property by means of false and fraudulent pretenses," (*id.* ¶ 34), "caused the $2,300,000 generated from the sale of the mortgage loans to be wire transferred from Fannie Mae to Liberty's brokerage account at Security Pacific" Bank ("Security Pacific").[9] (*Id.* ¶ 37.) The Indictment further alleges that as "part of the scheme and artifice, ... ASHLEY caused $2,300,000 to be wire transferred from Liberty's brokerage account at Security Pacific to Liberty's EAB Mortgage Account." [10] (*Id.* ¶ 38.) Specific facts are provided—"pool numbers" and approximate dates—as to two wire transfers that it is alleged Ashley "cause[d] to be transmitted" from Security Pacific to EAB. (*Id.* ¶ 39.)

The gravamen of Counts Six (6) and Seven (7) is the following allegation:

In or about and between September of 1990 and November of 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant KENNETH ASHLEY, having devised a scheme and artifice to defraud NatWest and to obtain money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting to do so, caused to be transmitted by means of wire communications in interstate commerce, signs, signals and sounds, to wit: wire transfers of cash and negotiable securities from Fannie Mae to Security Pacific and from Security Pacific to Liberty's account at EAB.

(*Id.* ¶ 34.)

■■■ As previously discussed, *see supra* at 1155, a scheme to defraud and a scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, are separate offenses. Although an indictment "need [d]o little more" than track the language of the statute charged and state the approximate time and place of the alleged crime, *see supra* at 1152, the Court, as discussed below, finds that Counts Six (6) and Seven (7) are insufficient to allege either type of a scheme by Ashley *vis-a-vis* NatWest.

In support of his motion to dismiss these counts, Ashley contends that they fail to advise him "of what false or fraudulent representations or promises he is alleged to have made ..., [and] fail to allege that Ashley made *any* false or fraudulent pretense representation or promise." (Ashley Mem. Supp. at 9.) Ashley claims that "[t]hese two counts, as drawn, leave the defendant without the 'clear, concise and definite written statement of the essential facts constituting the offense charged' which Rule 7(c) requires." (*Id.* at 9–10.) Ashley continues that "nowhere is [he] advised of 'the nature or character of the scheme or artifice relied upon, or the false pretenses, misrepresentations or promises forming a part of it.'" (*Id.* at 12 (quoting *United States v. Curtis,* 506 F.2d 985, 992 (10th Cir.1974).))

The Government claims that "because the indictment sufficiently apprises the defendants of the nature of the charges against

---

**9.** Security Pacific "was a financial institution with offices in New York, New York, where Fannie Mae maintained accounts from which it disbursed funds to pay for mortgage loans it purchased." (Indictment ¶ 33.)

**10.** European American Bank ("EAB") "was a financial institution with offices in Uniondale New York." (*Id.* ¶ 32.) "Liberty maintained a Mortgage Account with EAB ... [and] deposited repayments of mortgage loans into its Mortgage Account and advanced funds for mortgage loans from its Mortgage Account." (*Id.*)

them and alleges that the defendants used false pretenses, representations or promises to obtain loans from Freddie Mac and NatWest, their respective challenges to the indictment must fail." (Gov.Resp. at 15.) However, a careful reading of the Indictment reveals that there is no allegation in Counts Six (6) and Seven (7) that Ashley used false pretenses, representations, or promises in order to obtain loans from NatWest.

Indeed, in support of the allegation that Ashley "devised a scheme and artifice to defraud NatWest and to obtain money and property by means of false and fraudulent pretenses, representations and promises," (Indictment ¶ 34), no details are provided.[11] In other words, "[w]hat the 'scheme and artifice to defraud', or the 'false and fraudulent pretenses, representations and promises' referred to in the indictment were, is left to speculation." See Curtis, 506 F.2d at 989.

For example, did Ashley devise a scheme to line up "false borrowers" to pose as mortgage applicants so that Liberty could obtain, under false pretenses, the line of credit from NatWest which allowed it to borrow the $2.3 million NatWest Loan? Or, did Ashley devise a different scheme to acquire that loan for Liberty and to avoid repaying the same? If so, what was the nature of the scheme?

Although the Indictment alleges that "[u]pon the sale of the[ ] mortgage loans to Fannie Mae, Liberty *would* direct Fannie Mae to make payment to NatWest to satisfy Liberty's credit obligations," (Indictment ¶ 30 (emphasis added)), it is not alleged that Liberty *obligated* itself to do so. Moreover, in regard to the $2.3 million NatWest Loan at issue, the Indictment does not allege that Liberty *would*—never mind promised or agreed to—direct Fannie Mae to pay to NatWest the monies owed by Fannie Mae to Liberty. Rather, it is alleged that *"Liberty* agreed to repay the NatWest Loan promptly upon the sale of the loans to Fannie Mae." (*Id.* ¶ 35 (emphasis added).)

▮ In short, the thrust of Counts Six (6) and Seven (7) appears to be that after Liberty had promised to repay the NatWest Loan

promptly upon the sale of specified mortgage loans to Fannie Mae, Ashley caused the proceeds from that sale to be transferred to Liberty, not to NatWest. However, there is no allegation, for example, that Ashley obtained that loan on behalf of Liberty by fraudulently promising a prompt repayment which was in fact never intended by him. Merely failing to pay back a loan as promised—without any scheme—does not give rise to liability for wire fraud. See United States v. Kreimer, 609 F.2d 126, 128 (5th Cir.1980) ("[T]he statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of business contract. Its condemnation of a 'scheme or artifice to defraud' implicates only plans calculated to deceive.") (mail fraud).

▮ Although Counts Six (6) and Seven (7) track the language of Section 1343 and indicate the approximate time and place of the alleged crime, see Stavroulakis, 952 F.2d at 692, Ashley is not provided with any "facts and circumstances as will inform ... [him] of the specific offence[s] coming under the general description, with which he is charged." See Upton, 856 F.Supp. at 740. "Some substantial indication of the nature or character of any scheme or artifice to defraud, or to obtain money or property by means of false pretenses, representations or promises is requisite." Curtis, 506 F.2d at 990. "And it is not sufficient in this regard to merely plead the statutory language." Id. (citing Russell, 369 U.S. 749, 82 S.Ct. 1038).

In short, Counts (6) and Seven (7) fail to sufficiently allege a scheme by Ashley to defraud NatWest or a scheme by Ashley to obtain money or property from NatWest by means of false or fraudulent pretenses, representations, or promises. These counts "after all has been said and done, plead[ ] little more than the statutory language without any fair indication of the nature or character of the scheme or artifice relied upon, or the false pretenses, misrepresentations or promises forming a part of it." See Curtis, 506 F.2d at 992. As a result, Ashley is not "inform[ed] of the charges he must meet ... with enough detail that he may plead double

---

11. This, of course, is in stark contrast to the information about the alleged Freddie Mac

Scheme that was provided in the Indictment. See supra at 1155–1156.

jeopardy in a future prosecution based on the same set of events." *Stavroulakis,* 92 F.2d at 693 (citations omitted). In light of the above, the Court finds that Counts Six (6) and Seven (7) must be, and hereby are, dismissed.

### D. *Count Eight (8) and Nine (9)*

Count Eight (8) charges Ashley with conspiracy to commit bank fraud *vis-a-vis* the alleged First Penn Scheme. 18 U.S.C. § 371; 18 U.S.C. § 3551. Count Nine (9) charges him with the substantive crime of bank fraud in connection with that alleged scheme. 18 U.S.C. § 1344; 18 U.S.C. § 2; 18 U.S.C. § 3551. Ashley does not challenge the sufficiency of either of these counts.

### E. *Count Ten (10)*

■ Count Ten (10) charges Defendants with conspiracy to commit perjury. 18 U.S.C. § 371; 18 U.S.C. § 3551. As previously indicated, Section 371 provides as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined ... or imprisoned ... or both.

18 U.S.C. § 371.

> Count Ten (10) alleges, *inter alia,* that
>
> In or about the Spring and Summer of 1991, within the Eastern District of New York, the defendants KENNETH ASHLEY and FRANK LAGRUA, together with others, did knowingly and willfully

conspire to commit perjury, in violation of Title 18, United States Code, Section 1621.

(Indictment ¶ 56.)

> It was part of the conspiracy that to cover-up the fraudulent loans made to false borrowers, the defendants KENNETH ASHLEY and FRANK LAGRUA met with their co-conspirators and instructed the co-conspirators to testify falsely during depositions in the [Liberty] [C]ivil [C]ase.

(*Id.* ¶ 57.) Additionally, the Indictment specifies eleven (11) overt acts that it is alleged were committed by Defendants and their co-conspirators in furtherance of their conspiracy to commit perjury.[12]

■ Defendants do not seriously challenge the sufficiency of Count Ten (10).[13] Again, the Supreme Court has held that a conspiracy count need not precisely state all the elements essential to the commission of the substantive crime. *See Messina,* 481 F.2d at 880. Count Ten (10) of the instant Indictment clearly identifies that Defendants are charged with conspiracy to commit perjury. Moreover, it is clear from a juxtapositioning of this count of the Indictment against Section 371 that it tracks the language of the statute charged, states the approximate time and place of the alleged crime, *see Stavroulakis,* 952 F.2d at 692, and also provides sufficient detail, (*see* Indictment ¶¶ 57–60), regarding the alleged conspiracy. *See De Sapio,* 299 F.Supp. at 444–45; *Upton,* 856 F.Supp. at 740. In short, the Indictment charges a conspiracy to commit perjury during deposition testimony "with sufficient precision to inform the defendant[s] of the charges [t]he[y] must meet and with enough detail that [t]he[y] may plead double jeopardy in a future prosecution based on the same set of events." *See Stavroulakis,* 952 F.2d at 692; *see also Bonanno,* 177 F.Supp. at 113. In light of the foregoing,

---

**12.** As previously indicated, *see supra* at 1153, "the words [in Section 371] 'offense against the United States' encompass all offenses against the *laws* of the United States, not just offenses directed at the United States as target or victim." *Gibson,* 881 F.2d at 321 (emphasis added). Perjury is, of course, prohibited by a law of the United States. *See* 18 U.S.C. § 1621. Thus, conspiracy to commit perjury is prohibited by Section 371. *See, e.g., United States v. Marchisio,* 344 F.2d 653 (2d Cir.1965).

**13.** Defendants challenge the "perjury-based charges"—that is, Counts Ten (10) through Seventeen (17) on grounds that the matters at issue in the deposition testimony were not "material" to the Liberty Civil Case. (*See* Ashley Mem. Supp. at 16–22.) That contention is addressed by the Court in the next section of the instant Order.

the Court denies Defendants' motion to dismiss Count Ten (10) of the Indictment.

### F. Counts Eleven (11) Through Seventeen (17)

■ Counts Eleven (11) through Fourteen (14) charge Defendants with suborning perjury in violation of 18 U.S.C. § 1622 ("Section 1622"); 18 U.S.C. § 2; 18 U.S.C. § 3551. Counts Fifteen (15) through Seventeen (17) charge LaGrua with perjury. 18 U.S.C. § 1621 ("Section 1621"); 18 U.S.C. § 3551.

The perjury statute, Section 1621, provides as follows:

Whoever—

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any *material* matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any *material* matter which he does not believe to be true; is guilty of perjury. . . .

18 U.S.C. § 1621 (emphases added). The suborning perjury statute, Section 1622, provides as follows:

Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined . . . or imprisoned . . . , or both.

18 U.S.C. § 1622.

Count Eleven (11) of the Indictment alleges, *inter alia*, as follows:

On or about April 18, 1991, within the Eastern District of New York, the defendants KENNETH ASHLEY and FRANK LAGRUA did knowingly and willfully procure another to commit perjury, to wit: a false borrower, who having taken an oath that he would testify truthfully in a deposition taken in a civil case pending in the United States District Court for the Eastern District, did knowingly, willfully, unlawfully and contrary to his oath, state *material* matter which he did not believe to be true during said deposition and which is hereinafter set forth

. . . .

(Indictment ¶ 62 (emphasis added).) The Indictment then quotes with emphases certain parts of an unidentified deponent's testimony. First, the deponent testified that he "intend[ed] to occupy . . . property at 11 Lakeside Drive," but after he and his spouse received the financing for such premises, they did not move to the same because his spouse indicated that she did not wish to move to Long Island. (*See id.*) Further, the deponent testified that he was unaware at the time of the closing that he was to receive $5,000, and that he was likewise unaware when he went to Liberty for the loan closing that he was going to receive such monies. (*Id.*) Finally, Count Eleven (11) concludes with the following allegation:

In truth and in fact, as the defendants KENNETH ASHLEY and FRANK LAGRUA well knew and believed, the false borrower never intended to occupy the property at 11 Lakeside Drive when he applied for the loan with Liberty and the false borrower knew prior to the loan closing at Liberty that he was going to receive $5,000.00.

(*Id.* ¶ 63.)

Counts Twelve (12) through Fourteen (14) are similar in nature to Count Eleven (11). In short, each of these counts sets forth a date and a premises, and alleges that Defendants, on the specified date, procured a "false borrower" to commit perjury while testifying at a deposition in a civil case about a loan application for the specified premises. Significantly, each count emphasizes the alleged falsehoods at issue and alleges that they concerned "material matter." (*See* Indictment ¶¶ 62, 65, 68, 71.)

Counts Fifteen (15) through Seventeen (17) charge LaGrua with perjury in connection with deposition testimony given by him.

Specifically, those counts allege, *inter alia,* as follows:

> On or about June 26, 1991, within the Eastern District of New York, the defendant FRANK LAGRUA having taken an oath that he would testify truthfully in a deposition taken in a civil case pending in the United States District Court for the Eastern District of New York, did knowingly, willfully, unlawfully and contrary to his oath, state *material* matter which he did not believe to be true during said deposition and which is hereinafter set forth. . . .

(Indictment ¶ 75 (emphasis added).) Next, those counts quote specific portions of La-Grua's deposition testimony, emphasizing the alleged falsehoods therein. (*See id.*)

LaGrua suggests that Counts Eleven (11) through Fourteen (14)—which charge Defendants with suborning perjury—are insufficient because they do not contain "information suggesting that the borrowers' answers—whether they were truthful or false—had any *material* bearing on the *Freddie Mac* Action." (LaGrua Mem.Supp. at 21 (emphasis added).) LaGrua continues, *inter alia,* that "there is nothing inherently 'material' about these four loans, given the literally thousands of transactions in which Freddie Mac and Liberty engaged, and there was nothing 'material' to the *Freddie Mac* Action as to whether these witnesses did or did not intend to move into the homes." (*Id.*)

Similarly, LaGrua argues that Counts Fifteen (15) through Seventeen (17)—which charge him with perjury—must fail because "[n]othing in the indictment suggests why any of th[o]se issues was material to the *Freddie Mac* Action." (*Id.* at 19.) The Government responds that Counts Eleven (11) through Seventeen (17) are sufficient because each of the counts allege materiality, and the Government "has identified the statements that the grand jury considered material." (Gov.Resp. at 20.)

Courts in this circuit have followed the Ninth Circuit holding that "the materiality requirement of a perjury indictment may be met by a general statement that the matter was material." *United States v. Ponticelli,* 622 F.2d 985, 989 (9th Cir.) (citation omitted), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980). For example, the Court in *United States v. Coiro* stated that "when a defendant attacks a perjury indictment as deficient with respect to materiality, the court need look no further than the face of the indictment itself; a simple allegation of materiality will defeat such a motion for dismissal."[14] 785 F.Supp. 326, 332 (E.D.N.Y. 1992) (citing *United States v. Sun Myung Moon,* 532 F.Supp. 1360, 1373 (S.D.N.Y. 1982)).

As previously indicated, each of the suborning perjury counts against Defendants—Counts Eleven (11) through Fourteen (14)—and each of the perjury counts against LaGrua—Counts Fifteen (15) through Seventeen (17)—alleges that the falsehoods at issue concerned "material matter." (*See* Indictment ¶¶ 62, 65, 68, 71, 75.) Thus, based upon the rationale of cases such as *Ponticelli, Coiro,* and *Moon,* this Court rejects Defendants' "materiality" attack upon those counts.[15] In light of the foregoing, the Court denies the motions to dismiss Counts Eleven (11) through Seventeen (17).

### Conclusion on Defendants' Motions to Dismiss

For the reasons indicated above, the Court grants Ashley's motion to dismiss Counts Six (6) and Seven (7) of the Indictment. As to the remaining counts, Defendants' motions to dismiss are denied. The Court now turns its attention to Defendants' severance motions.

### II. Severance Motions

#### A. Ashley's Rule 8(b) Motion to Sever

Ashley moves to have the trial on the Freddie Mac counts and the perjury-related

---

14. None of the cases upon which LaGrua relies addressed the sufficiency of an indictment. *See United States v. Gaudin,* — U.S. —, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995); *Kungys v. United States,* 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988); *United States v. Clark,* 918 F.2d 843, 845 (9th Cir.1990).

15. Of course, "[w]hether or not the government is able to establish materiality at trial is, clearly, a matter for another day." *See Coiro,* 785 F.Supp. at 332.

counts severed from his trial on the remaining charges against him. Ashley claims that these counts were improperly joined pursuant to Federal Rule of Criminal Procedure 8(b) ("Rule 8(b)"). As the Court has granted Ashley's motion to dismiss Counts Six (6) and Seven (7) of the Indictment, *see supra* at 1160, the issue presently before the Court is whether or not Counts One (1) through Five (5), and Counts Ten (10) through Seventeen (17), are improperly joined with Counts Eight (8) and Nine (9). In other words, are the Freddie Mac Scheme counts and the perjury-related counts improperly joined with the First Penn Scheme counts?

Rule 8 provides, in relevant part, as follows:

(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, ... are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P. 8.

 "Unlike Rule 8(a), Rule 8(b) does not permit joinder of defendants solely on the ground that the offenses charged are of 'the same or similar character.'" *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir.1988). "Thus, though both subdivisions of Rule 8 focus on the nature of the acts constituting the alleged offenses, 8(b) provides a more restrictive test when multiple defendants are involved." *Id.* at 1042–43 (citation omitted). In the case at bar, Ashley has expressly based his severance motion on Rule 8(b), claiming that this more stringent standard has not been satisfied.[16]

 "Rule 8 does not explicitly provide a standard that governs when multiple offenses *and* multiple defendants are joined in one indictment." *Turoff*, 853 F.2d at 1043. The Second Circuit, however, has indicated that when multiple defendants are charged with multiple counts, Rule 8(b) governs the validity of joinder.[17] *See id.; Attanasio*, 870 F.2d 809. Thus, this Court now turns its attention to whether or not the Freddie Mac counts and the perjury-related counts were properly

**16.** The Government proposes that "[a]lthough Ashley relies on Rule 8(b) as a basis for his severance motion, he is actually seeking a severance of offenses pursuant to Rule 8(a)." (Gov. Mem.Resp. at 4 n. 1.) Ashley, however, replies that "[i]n point of fact, the defendant's argument meant what it said and Ashley is *actually* moving for a severance under Rule 8(b)." (Russo Oct. 6, 1995 Letter at 1.)

**17.** This Court declines to follow a line of cases holding that Rule 8*(a)* governs in the atypical situation (present in the case at bar) where "a defendant in a multiple defendant case named in one count seeks to sever other counts in which he alone is charged...." *United States v. Biaggi*, 705 F.Supp. 852, 858 (S.D.N.Y.1988) (emphasis added) (Motley, J.) (quoting *United States v. Clemente*, 494 F.Supp. 1310, 1315 (S.D.N.Y. 1980) (Sands, J.) (in turn citing *United States v. Isaacs*, 493 F.2d 1124, 1158 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974))); *see also United States v. Eufrasio*, 935 F.2d 553, 570 n. 20 (3d Cir.), *cert. denied*,

502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991).

First, the Government does not argue that the standards of Rule 8(a) govern the instant motion by Ashley; instead, the Government maintains that "[r]egardless of whether the court applies the standard set forth in Rule 8(a) or the more strict standard set forth in Rule 8(b), Ashley is not entitled to a severance." (Gov.Resp. at 5.) Moreover, the Second Circuit, while indicating that the analyses in *Biaggi* and *Clemente* were "thoughtful" ones, expressly left open the issue of Rule 8(a)'s applicability in the above-described situation. *United States v. Biaggi*, 909 F.2d 662, 675–76 (2d Cir.1990) (affirming on district court's alternative—Rule 8(b)—analysis), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991). In light of the above, and the language in Second Circuit cases such as *United States v. Attanasio*, this Court finds that the standards of Rule 8(b) govern whether or not joinder was proper. *See* 870 F.2d 809, 814 (2d Cir.1989) ("Where ... the joinder involves both multiple offenses and multiple defendants, Rule 8(b) *must* be applied.") (citing *Turoff*, 853 F.2d at 1043) (emphasis added).

joined, pursuant to Rule 8(b), with the First Penn counts.

Rule 8(b) provides that defendants may be joined "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). The Second Circuit has "read this to mean that the acts must be 'unified by some substantial identity of facts or participants,' or 'arise out of a common plan or scheme.'" *Attanasio*, 870 F.2d at 815 (citations omitted).

The Government claims that the Freddie Mac Scheme and the First Penn Scheme "were part of a common plan to keep Liberty in business." (Gov.Mem.Resp. at 6.) Specifically, the Government indicates that its proof at trial will establish that

> Liberty was having financial difficulties and needed to generate cash. To alleviate the financial problems, the defendants and others participated in schemes to defraud various banks as part of a common plan to generate money to keep Liberty in business.[18]

(*Id.* at 5–6.)

■ Ashley, however, notes that the Indictment does not contain any allegation suggesting that the Freddie Mac Scheme and the First Penn Scheme were part of any "common plan ... to keep Liberty in business." (*See* Russo Oct. 6, 1995 Letter at 2.) Ashley suggests that the propriety of a Rule 8(b) joinder must be determined solely by reference to the Indictment, and that because such a "common plan" was not alleged

in that instrument, the joinder at issue is not permitted by Rule 8(b).

The Court's research on this issue has not revealed a Second Circuit case directly on point. However, the Court does note that the Eleventh Circuit has cited the Second Circuit's decision in *United States v. Friedman*, 854 F.2d 535 (2d Cir.1988), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989), as supporting its holding that Rule 8(b) joinder must appear proper from the indictment. *United States v. Morales*, 868 F.2d 1562, 1567 (11th Cir.1989). In *Friedman*, the Second Circuit indicated, without discussion, that "[i]n evaluating the defendants' claims of misjoinder under Rule 8(b), then, our task is limited simply to determining whether the indictment properly alleged their participation in a RICO conspiracy."[19] *Id.* at 561.

■ In light of the above-quoted statement in *Friedman*, and pursuant to the rationale provided in cases such as *Morales*, 868 F.2d at 1568 and *United States v. Grey Bear*, 863 F.2d 572, 576–77 (8th Cir.1988),[20] this Court holds that Rule 8(b) is a pleading requirement. Therefore, the propriety of joinder is to be determined solely by examining the allegations in the Indictment.

■ The Indictment does not allege any common plan by Defendants to save Liberty. Further, the Government does not argue, nor the Indictment reveal, that the acts or transactions constituting the offenses charged in the Freddie Mac and perjury-related counts are "unified by some substantial identity of facts or participants" with the acts or transactions constituting the offenses charged in the First Penn counts.[21] *See Attanasio*, 870

---

**18.** The Indictment does not allege that LaGrua participated in the First Penn Scheme (nor in the NatWest Scheme). In light of this, the Court does not read this statement by the Government as suggesting that LaGrua, although uncharged in the First Penn Scheme, played any role therein.

**19.** While acknowledging that statement in *Friedman*, Judge Cote recently held that it was not "necessary that the relationship justifying joinder appear in the indictment." *United States v. De Yian*, 1995 WL 368445, at *10 (S.D.N.Y. June 21, 1995). The *De Yian* court followed the District of Columbia Circuit and the First Circuit which "endorsed the ability of the Government to sup-

port joinder through post-indictment proffers." *Id.* at *9 (citing *United States v. Halliman*, 923 F.2d 873, 883 (D.C.Cir.1991) and *United States v. Talavera*, 668 F.2d 625 (1st Cir.), *cert. denied*, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982)).

**20.** In *Grey Bear*, the Eight Circuit *en banc* was divided five to five on the issue, *inter alia*, of whether or not joinder is to be determined on the face of the indictment alone.

**21.** Obviously, the fact that the alleged Freddie Mac and First Penn schemes are of the same or similar character does not permit Rule 8(b) joinder. *See, e.g., Turoff*, 853 F.2d at 1042. Nor is it

F.2d at 815. Thus, the Court finds that, pursuant to Rule 8(b), Counts Eight (8) and Nine (9) were improperly joined with, and therefore must be severed from, Counts One (1) through Five (5) and Counts Ten (10) through Seventeen (17).

### B. *LaGrua's Rule 14 Motion to Sever*

LaGrua moves, pursuant to Federal Rule of Criminal Procedure 14 ("Rule 14"), for severance of his trial from that of Ashley's. Rule 14 provides, in relevant part, as follows:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires....

Fed.R.Crim.P. 14.

The Supreme Court has explained that "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." *Zafiro v. United States,* 506 U.S. 534, 541, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993). Further, the *Zafiro* Court indicated that "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." [22] *Id.,* 506 U.S. at 539, 113 S.Ct. at 938.

Similarly, the Second Circuit has explained that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa,* 11 F.3d 315, 319 (2d Cir. 1993), *cert. denied,* — U.S. —, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). Moreover, "there is a preference, in the federal system, for the joint trial of defendants indicted to-

gether...." *Id.* (citing *Zafiro,* 506 U.S. at 537, 113 S.Ct. at 937).

LaGrua advances the following five (5) grounds in support of his Rule 14 severance motion:

> (1) he will be prejudiced as the trial will be significantly longer because of the NatWest and First Penn counts—counts which do not charge LaGrua with any wrongdoing.
>
> (2) he will be prejudiced by the evidence pertaining to the alleged NatWest and First Penn schemes—schemes in which it is not alleged that LaGrua participated.
>
> (3) he will be prejudiced by evidence of the NatWest and First Penn schemes because the sums of money involved in those schemes is significantly greater than the amounts involved in the Freddie Mac Scheme.
>
> (4) he will be prejudiced because the jury "could come to disregard the substantial differences between Mr. LaGrua and Ashley in Liberty's affairs and treat the two defendants as sharing identical positions, influences, and interests."
>
> (5) if LaGrua was tried separately, Ashley "could testify at a separate trial in such a way as to exonerate Mr. LaGrua but, at a joint trial, might not be inclined to do so."

(LaGrua Mem.Supp. at 24–26.)

As a preliminary matter, the Court notes that the first three grounds are based upon the inclusion of the NatWest and First Penn counts in a joint trial. The Court, however, has dismissed the NatWest counts, *see supra* at 1160, and severed the First Penn counts. *See supra* at 1164–1165. Thus, the Court need not, and does not, address LaGrua's arguments that he would be prejudiced by the inclusion of those counts in his trial with Ashley.

LaGrua also maintains that he would be prejudiced by trial with Ashley because "LaGrua—who was only an employee of Lib-

---

permitted merely because two otherwise unrelated schemes had Ashley as a common participant. *E.g., United States v. Giraldo,* 859 F.Supp. 52, 55 (E.D.N.Y.1994) ("The existence of a single, common participant ... does not satisfy the requirements of Rule 8(b).").

**22.** LaGrua does not argue that he and Ashley were improperly joined under Rule 8(b).

erty and who had no ownership interest in Liberty and no stake in the outcome of the *Freddie Mac* Action—would find himself at a joint trial at the defense table with Ashley, the person who was Liberty's leading executive, one of its principal shareholders, and one of the plaintiffs in the *Freddie Mac* Action." (LaGrua Mem.Supp. at 25.)

█ The Court is unpersuaded by this argument. The Second Circuit has "repeatedly held that, absent a showing of substantial prejudice, defendants who are jointly indicted should be jointly tried."[23] *United States v. Ventura*, 724 F.2d 305, 312 (2d Cir.1983) (citations omitted). This Court has no reason to believe that "the jury could come to disregard the substantial differences between Mr. LaGrua and Ashley in Liberty's affairs and treat the two defendants as sharing identical positions, influences, and interests." (LaGrua Mem.Supp. at 25.) In any event, the Court will provide the jury with an appropriate admonitory instruction.

█ Finally, the Court considers LaGrua's argument that his trial should be severed from that of Ashley's because of "the possibility that ... Ashley could testify at a separate trial in such a way as to exonerate Mr. LaGrua but, at a joint trial, might not be inclined to do so." (LaGrua Mem.Supp. at 26.) The Second Circuit has instructed that in deciding whether to grant severance based on a defendant's need to call a co-defendant, a district court should consider the following:

(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege;

(2) the degree to which the exculpatory testimony would be cumulative;

(3) the counter arguments of judicial economy; and

(4) the likelihood that the testimony would be subject to substantial, damaging impeachment.

*United States v. Wilson*, 11 F.3d 346, 354 (2d Cir.1993) (citations omitted), *cert. denied*, —— U.S. ——, 114 S.Ct. 1415, 128 L.Ed.2d 86 (1994).

Applying these considerations to the case at bar, it is clear that LaGrua's motion for severance must fail. As to the first factor, LaGrua has made *no* showing that Ashley would testify at a severed trial, never mind that Ashley would waive his Fifth Amendment privilege. Next, LaGrua has failed to give any indication as to the substance of any testimony by Ashley at a severed trial. Thus, the Court is unable to consider the second factor, that is the degree to which any exculpatory testimony would be cumulative. As to the fourth factor, although LaGrua has failed to indicate the substance of any testimony by Ashley, it would appear that Ashley's testimony would be subject to effective impeachment, because the Government seeks to prove his participation in the alleged conspiracies with which LaGrua is charged. Finally, the Government indicates—and the Court has no reason to doubt—that "there would be substantial duplication of proof at separate trials because the evidence against both defendants as to the Freddie Mac Counts is virtually identical." (Gov.Resp. at 14.) Thus "the third factor—judicial economy—falls squarely on the side of denying the application." *See United States v. Leonard*, 817 F.Supp. 286, 298 (E.D.N.Y.1992).

Based upon the foregoing analysis, the Court denies LaGrua's motion for severance pursuant to Rule 14.

### III. *Discovery Motions*

#### A. *Ashley's "Selective Prosecution" Motion*

█ Ashley moves for discovery of documents reflecting communications between Freddie Mac and the Department of Justice concerning Ashley or Liberty. (Ashley Mem.Supp. at 13.) Ashley claims that he

---

**23.** This principle is "particularly true" where—as in the case at bar—the crimes charged involve a common scheme or plan. *United States v. Gambino*, 729 F.Supp. 954, 970 (S.D.N.Y.) (citing *Turoff*, 853 F.2d at 1042–43), *aff'd in part and rev'd in part on other grounds*, 920 F.2d 1108 (2d Cir.1990); *see also Rosa*, 11 F.3d at 341 ("Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial.") (citations omitted).

is entitled to such documents because he has made a "nonfrivolous prima facie showing ... that he is the victim of selective prosecution." [24] (*Id.*) In short, Ashley maintains that "Freddie Mac brought about the instant prosecution and the United States Justice Department went forward with it because Ashley and Liberty filed a multi-million dollar lawsuit against Freddie Mac in November 1990." (Russo Aug. 4, 1995 Affid. ¶ 12.)

As discussed below, the Court denies Ashley's discovery motion because he has not complied with Local Criminal Rule 3(d).[25] That rule provides as follows:

> No motion [for discovery] ... shall be heard unless *counsel for the moving party* files with the court simultaneously with the filing of the moving papers an affidavit certifying that *said counsel* has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issue raised by the motion without the intervention of the court and has been unable to reach such an agreement. Such affidavit shall specify the time when, the place where and the duration of the said conference. If part of the issues raised by motion have been resolved by agreement, the affidavit shall specify the issues so resolved and the issues remaining unresolved.

Local Criminal Rule 3(d) (emphases added).

In support of his discovery motion, Ashley indicates that *LaGrua's* counsel sought specified documents and that *LaGrua's* request was denied. (Russo Aug. 4, 1995 Affid. ¶ 19.)

Ashley does not indicate that *his* counsel requested those documents or that his counsel conferred with the Government in good faith to resolve any discovery dispute. Although it may be that such a discovery request by Ashley would have elicited the same response from the Government as did LaGrua's request, (*see* Wasserman's May 11, 1995 Letter at 2 ("This request is beyond the scope of Rule 16 ... and is denied.")), Local Criminal Rule 3(d) does not provide an exception to its requirements when a similar request has been advanced by counsel for a co-defendant. Thus, because it is clear that Ashley has not complied with the requirements of Local Criminal Rule 3(d), the Court denies, without prejudice, Ashley's discovery request.

Parenthetically, the Court notes that the Government has indicated that it is "not aware of any documents reflecting written or oral communications between Freddie Mac and the Department of Justice." [26] (Gov. Resp. at 21.) Also, the Government maintains that it is "not aware of any documents that are relevant to Ashley's claim of selective prosecution." [27] (Wasserman Oct. 23, 1995 Letter at 1.)

### B. *LaGrua's Rule 16 Motion*

By way of background, the Court notes that prior to requesting the Court's intervention in this matter, LaGrua requested, by letter, that the Government provide to him, *inter alia*, seven (7) categories of documents that are the focus of LaGrua's instant discovery motion. (*See* Batista May 5, 1995 Letter

---

**24.** Alternatively, Ashley seeks the production of those documents on the "theory that they are 'material to the preparation of the defendant's defense' pursuant to Rule 16(a)(1)(c)." (Russo Aug. 4, 1995 Affid. at 14 n. 2.)

**25.** Of course, the Court's granting of Ashley's request to join in the motions of LaGrua, *see supra* at 1152, does not obviate Ashley's compliance with Local Criminal Rule 3(d).

**26.** Further, by letter dated October 23, 1995, the Government informed the Court that it "has complied with its discovery obligations pursuant to Rule 16, and has supplied Ashley with documents that were received by the FBI from Freddie Mac which were provided during the course

of the criminal investigation." (Wasserman Oct. 23, 1995 Letter at 1.)

**27.** The Government argues that Ashley's "allegation of selective prosecution is baseless," because "this case was referred to the FBI by CitiCorp, not Freddie Mac." (Wasserman Oct. 23, 1995 Letter at 1; *see also* Gov.Resp. at 21.) Although the Court obviously need not, and does not, address Ashley's "selective prosecution" claim at this time, it does note that even accepting as accurate the above-quoted indication as to the F.B.I.'s referral source, it is questionable whether such information would dispose of a "selective prosecution" claim. *See United States v. White*, 972 F.2d 16, 19–20 (2d Cir.) (setting forth elements required to establish a *prima facie* case of selective prosecution), *cert. denied*, —— U.S. ——, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992).

(Ex. F. to LaGrua Not.Mot.).) The documents in those categories are of three (3) types: first, documents pertaining to any communications between the Government and Freddie Mac, and between the Government and the alleged "false borrowers," (*see id.* at 2–3); secondly, documents describing or pertaining to the four properties for which the alleged "false borrowers" filed mortgage applications, (*see id.* at 3); and, finally, documents pertaining to a specified attorney's representation of the "false borrowers" in the Liberty Civil Case. (*See id.*) In response, the Government indicated that, except for relevant documents regarding the four properties, the above-referenced requests were "beyond the scope of Rule 16 ... and [were] denied." [28] (Wasserman May 11, 1995 Letter at 1–2 (Ex. G to LaGrua Not.Mot.).)

Presently before the Court is LaGrua's motion, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(C) ("Rule 16(a)(1)(C)"), for disclosure of the documents described above. (*See* LaGrua Not.Mot. at 2–3; LaGrua Mem.Supp. at 26–34.) Rule 16(a)(1)(C) provides as follows:

> Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph ... papers, documents, ... or copies or portions thereof, which are within the possession, custody or control of the government, and *which are material to the preparation of the defendant's defense* or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

Fed.R.Crim.P. 16(a)(1)(C) (emphasis added). LaGrua maintains that "[t]he documents sought by ... [his] discovery request are material—indeed, they are vital—to the defense of this action." (LaGrua Mem.Supp. at 30.)

The Second Circuit has provided the following guidance regarding Rule 16(a)(1)(C) "materiality":

[e]vidence that the government does not intend to use in its case in chief is material *if it could be used to counter the government's case or to bolster a defense;* information not meeting either of those criteria is not to be deemed material within the meaning of the Rule merely because the government may be able to use it to rebut a defense position.... Nor is it to be deemed material merely because it would have dissuaded the defendant from proffering easily impeached testimony.

*United States v. Stevens,* 985 F.2d 1175, 1180 (2d Cir.1993) (citations omitted) (emphasis added).

■■■ "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case." *United States v. Maniktala,* 934 F.2d 25, 28 (2d Cir.1991) (quoting *United States v. Ross,* 511 F.2d 757, 762–63 (5th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975)) (further citation omitted). Evidence is "material" for purposes of Rule 16(a)(1)(C) if pretrial disclosure will enable the defendant "significantly to alter the quantum of proof in his favor." *See Maniktala,* 934 F.2d at 28; *see also United States v. McGuinness,* 764 F.Supp. 888, 895 (S.D.N.Y.1991).

■■■ "Before the government can be required to produce evidence under Rule 16(a)(1)(C) on the grounds that it is material to the defense, it is incumbent upon the defendant to make a *prima facie* showing of materiality." *McGuinness,* 764 F.Supp. at 894 (internal quotations omitted) (collecting cases); *see Maniktala,* 934 F.2d at 28. To establish a showing of materiality, a defendant must offer more than the conclusory allegation that the requested evidence is "material." *McGuinness,* 764 F.Supp. at 895.

■■■ As was earlier noted, in response to the instant discovery motion, the Government indicates that it is "not aware of any documents reflecting written or oral commu-

---

**28.** The Government agreed to make available to LaGrua "[a]ll relevant documents relating to the [four specified] properties...." (*Id.* at 2.) To the extent that LaGrua moves for further disclosure in regard to those properties based upon the

*Gelt Funding* case, (*see* LaGrua Mem.Supp. at 33), the Court denies LaGrua's motion, because it has found that *Gelt Funding* is not relevant to the instant criminal action. *See supra* at 1156–1157.

nications between Freddie Mac and the Department of Justice." [29] (Gov.Mem.Resp. at 21.) In light of this representation, the Court denies LaGrua's motion for discovery of documents reflecting such communications subject to the following caveat: the Government has an affirmative obligation to employ reasonable efforts to determine the existence, or nonexistence, of the requested documents. Presumably, the Government, prior to stating that it is unaware of any such documents, conducted such an inquiry. If that is not the case, however, the Government is hereby directed to do so. Should the Government become aware of the existence of such documents, defense counsel should be so informed, and the Court, if requested, will revisit this discovery request.

Those documents, however, are but a portion of the documents requested by LaGrua. *See supra* at 1168. Therefore, the Court now turns its attention to whether or not the remaining requested documents are subject to disclosure pursuant to Rule 16(a)(1)(C).

■ LaGrua requests documents pertaining to any communications between the Government and the alleged "false borrowers." Specifically, LaGrua argues that "documents relating to communications between the Government and the four witnesses ["false borrowers"] ... will materially assist the discovery aspects of [his] preparation for trial without in any way interfering in the Government's prosecution." (LaGrua Mem.Supp. at 32.) LaGrua continues that "[t]hese individuals have pleaded guilty, [and] they have obviously entered [into] cooperation agreements with the Government, and ... will testify at trial." (*Id.*)

LaGrua has not specified what he is looking for in those documents, why he expects it to be there, and what use he intends to make

of the information. *See United States v. Failla,* 1993 WL 547419, at *8 (E.D.N.Y. Dec. 21, 1993). It appears that LaGrua is requesting documents pertaining to any communications between the Government and the alleged "false borrowers" for impeachment purposes in anticipation of trial testimony by these individuals. Rule 16, however, expressly states that it does not "authorize the discovery or inspection of statements made by government witnesses or prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed.R.Crim.P. 16(a)(2).

The Jencks Act, 18 U.S.C. § 3500, provides, in part, that

> [i]n any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection *until said witness has testified on direct exam in the trial of the case.*

18 U.S.C. § 3500(a) (emphasis added). Thus, any request by LaGrua for these documents based upon their impeachment value is premature. [30] *See McGuinness,* 764 F.Supp. at 896 ("It is well settled that the government is not required to disclose impeachment material before the relevant witness has testified.") (collecting cases). In light of the foregoing, the Court denies LaGrua's motion for discovery of documents reflecting communications between the Government and the "false borrowers."

■ Finally, the Court considers LaGrua's motion for discovery of documents pertaining to a specified attorney's represen-

---

**29.** By way of reply, LaGrua's co-defendant then provided to the Court a copy of what he identified as "an F.B.I. Memorandum, dated June 17, 1991 which ... detail[s] ... communications between Karen Kahn, an investigator for ... [Freddie Mac], and special agents of the Federal Bureau of Investigation." (Russo Oct. 6, 1996 Letter at 3.) However, that document appears to be an internal government memorandum regarding an investigation of "possible fraudulent activity," (*see id.* at Ex. A), and specifically exempted from the purview of Rule 16 are "internal gov-

ernment documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case." Fed.R.Crim.P. 16(a)(2).

**30.** The Government indicates that "[t]o the extent that the defendants' request falls within the disclosure of impeachment material, the government will provide all such material sufficiently in advance of trial." (Gov.Mem.Resp. at 21 n. 6.)

tation of the "false borrowers" in the Liberty Civil Case—individuals who allegedly perjured themselves during deposition testimony in that case. LaGrua maintains that those documents "will materially assist [his] defense of the perjury-related charges." (LaGrua Mem.Supp. at 31.)

Specifically, LaGrua indicates that at trial he will argue that "he had no role in the perjuries, if any, [that] the four deponents allegedly committed during their depositions." (*Id.* at 31.) Further, LaGrua states that he will take the position that he, "a nonparty to the *Freddie Mac* Action who had no stake in that litigation's outcome, [did not] have any motive or reason to suborn perjury by others in the *Freddie Mac* Action or to commit perjury himself." (*Id.*) LaGrua indicates that he "intends to subpoena [the attorney] to testify at trial about his relationship with the witnesses, with Liberty, and with the lawyers representing Liberty in the *Freddie Mac* action." [31] (*Id.*) He concludes with the contention that "[c]learly, the documents sought ... [in this regard] would assist in preparation for trial and the examination of [the attorney for the false borrowers] at trial." (*Id.* at 31–32.)

■ After careful consideration of LaGrua's arguments as to the materiality of any documents pertaining to the specified attorney's representation of the "false borrowers," the Court finds that LaGrua has not made a *prima facie* showing of materiality. As an initial matter, LaGrua has not specified what he is looking for in those documents, why he expects it to be there, and what use he intends to make of the information. *See Failla,* 1993 WL 547419, at *8. Moreover, LaGrua has failed to establish how pretrial disclosure of such documents will enable him to "significantly to alter the quantum of proof in his favor." [32] *See McGuinness,* 764 F.Supp. at 895. In light of LaGrua's failure to make a *prima facie* showing of materiality

as to these requested documents, the Court denies this discovery motion by LaGrua.

### C. *LaGrua's Rule 404(b) Motion*

Finally, LaGrua moves for disclosure of all Rule 404(b) evidence upon which the Government intends to rely at trial. The Government responds that it is unaware of any 404(b) evidence as to LaGrua. (*See* Wasserman Oct. 23, 1995 Letter at 1–2). Further, the Government indicates that should it "become aware of such evidence, [it] will immediately notify counsel." (*Id.*) Based upon this representation by the Government, LaGrua's request is denied.

### CONCLUSION

Based upon the foregoing analysis, the following is the Court's ruling with regard to the pending motions in this action:

(1) Ashley's motion to dismiss Counts Six (6) and Seven (7) of the Indictment is granted; the remaining of Defendants' motions to dismiss are denied;

(2) Ashley's motion to sever Counts (8) and (9) of the Indictment is granted; LaGrua's motion to sever is denied; and

(3) Defendants' motions for discovery are denied.

SO ORDERED.

■

---

31. The Court notes that the Government does not suggest that the attorney for the false borrowers is a government witness or a prospective government witness.

32. Merely because the Government may be able to use those documents to rebut LaGrua's defense position does not mean that they are "material" within the purview of Rule 16. *See Stevens,* 985 F.2d 1175.